(No. 64701.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CLARENCE HAYES, Appellant.

*Opinion filed November 21, 1990.*

92

Randolph N. Stone, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Renee Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

Lisa S. Simmons and Susan J. Flieder, of Wildman, Harrold, Allen & Dixon, and Roslyn C. Lieb, all of Chicago, for *amicus curiae* Chicago Lawyers' Committee for Civil Rights Under Law, Inc.

JUSTICE WARD delivered the opinion of the court:

The defendant, Clarence Hayes, was convicted following a jury trial in the circuit court of Cook County of the murder of Ronald Nelson and on six related counts of armed robbery. The defendant waived a jury for purposes of a capital sentencing hearing, and the trial judge sentenced the defendant to death and imposed concurrent 30-year sentences for each of the six armed robbery counts. The death sentence was stayed (107 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The defendant raises 25 issues on appeal which, for ease of review, are grouped to reflect whether the issues relate to pretrial, trial or sentencing matters. The issues which relate to the pretrial stage include (1) whether the trial court erred in ordering the defense to disclose to the State potentially impeaching statements by prosecution witnesses to a defense investigator; (2) whether the State improperly used the grand jury process to obtain pretrial discovery from defense witnesses; (3) whether the defendant was deprived of his sixth amendment right to have counsel present at pretrial lineups; and (4) whether his conviction must be reversed because the warrant for his arrest failed to articulate probable cause on its face. The defendant raises nine issues concerning the conduct of the trial itself: (1) whether he was denied a fair trial when a State witness testified that the police

tried for two weeks to apprehend him; (2) whether his fifth amendment privilege against self-incrimination was violated by testimony that he failed to "turn himself in" to the police; (3) whether his fourth amendment right to be free from unreasonable searches and seizures was violated by testimony that the police secured a warrant for his arrest; (4) whether he was denied a fair trial by the introduction of testimony that witnesses did not identify persons other than the defendant; (5) whether he was denied a fair trial by the admission of testimony regarding the details of third-party identifications of the defendant; (6) whether testimony and prosecutorial remarks regarding the victim's family deprived him of a fair trial; (7) whether testimony that the defendant made racial comments as he fled the scene of the crime deprived the defendant of a fair trial; (8) whether he was denied a fair trial by the admission of evidence suggesting prior criminal conduct; and (9) whether the cumulative effect of improperly admitted evidence denied the defendant a fair trial. The defendant's allegations of error at the sentencing phase include: (1) whether the defendant's death sentence must be vacated because the circuit court relied in aggravation upon section 5—5—3.2(a)(9) of the Unified Code of Corrections (Ill. Rev. Stat., 1985, ch. 38, par. 1005—5—3.2(a)(9)), in violation of the eighth and fourteenth amendments of the United States Constitution; (2) whether section 5—5—3.2(a)(9) violates the first amendment of the United States Constitution; (3) whether section 5—5—3.2(a)(9) violates the equal protection provisions of the United States and Illinois Constitutions; (4) whether section 5—5—3.2(a)(9) is inapplicable to the facts in this case; (5) whether the defendant was denied a fair sentencing hearing by the admission of victim impact evidence; (6) whether the defendant was denied a fair sentencing hearing by the introduction of testimony by the victim's son that the

defendant would kill again; and (7) whether the cumulative effect of inadmissible information and impermissible aggravating factors made the sentencing result unreliable, in violation of the eighth amendment. The defendant also raises a number of challenges to the constitutionality of the Illinois death penalty statute, which, as we discuss below, we need not address.

At the defendant's trial, the State introduced the testimony of four of the armed robbery victims and of two bystanders. Roger Nelson, the murder victim's son, testified that he and his fiancee, Sandra Wissink, attended church services on March 17, 1985, with his mother, Marion Nelson, and his father, Ronald Nelson (the victim). The family attended services at the Roseland Christian Ministries Center, located at 110th Street and Michigan Avenue in Chicago. The Nelson family lingered for 10 or 15 minutes after the church services ended to talk to the pastor of the Center, Reverend Van Zanten, and his wife, Donna. At approximately 1:45 or 1:50 p.m., the Nelsons and Sandra left the church and walked across the street to the fenced lot where they had parked their cars. As they walked toward their cars, a man holding a gun approached them and ordered them into Ronald Nelson's car. The gunman, whom Roger identified as the defendant, wore a long dark coat, a baseball cap with a Playboy insignia and a light-colored shirt.

The gunman crouched by the open door on the driver's side of the car and demanded their money. After the men handed the assailant their wallets and the women gave him their purses, the assailant insisted that they were holding something back. He demanded more money and threatened to kill someone if he discovered they were holding out on him. When the Nelsons told the gunman that they had given him everything they had, he became angry and insisted that they were lying. He

pointed the gun at each person in the car, telling them that he would kill someone if necessary.

After approximately five minutes, Donna Van Zanten, the pastor's wife, and her son, Kent, walked out of the church toward the parking lot. As Donna and Kent approached, the assailant waved the gun at them and ordered them into the car.

Donna and Kent got into the back seat with Roger and Sandra. After Donna handed the assailant her purse and Kent gave him his wallet, the assailant continued to threaten the passengers and demanded more money. Approximately five minutes after the Van Zantens got into the car, the assailant grabbed the victim's lapel and saw that he had a checkbook in his inside pocket. The victim explained to the assailant that he did not give him the checkbook because he did not think he would be able to use it. The assailant handed the checkbook back to the victim, called him a "god damn lying bastard" and fatally shot him in the abdomen. The assailant then stood up, clutched the purses to his chest and jogged away. Sandra Wissink Nelson, Donna Van Zanten and Kent Van Zanten also testified at trial. Their description of the events leading up to the shooting death of Ronald Nelson coincided with that of Roger Nelson.

Larry Stewart and Harold Smith, two bystanders, testified that they were working on a car near the parking lot when they heard arguing and a loud "bang like" noise. They testified that they saw a man with a gun, clutching some purses, running toward them. As the assailant ran by, he told the witnesses, "You brothers, you be cool because you know them was honkies over there." They then heard Roger, whom Harold knew from the Center, shout to them that the man on the run had just "shot my Dad."

Several of the witnesses testified regarding their involvement in the subsequent investigation of Ronald Nel-

son's death. Roger Nelson testified that he spent be-
tween six and seven hours after the shooting at the
police station with Sandra Wissink and the Van Zantens,
looking at pictures, but did not identify any of the pho-
tos as the assailant. Kent Van Zanten testified that he
and his mother rode around the neighborhood with the
police for 1½ hours after the shooting but were not able
to find the offender. He also testified that he looked
through at least five books of photographs the day of the
shooting in an effort to find the assailant. He testified
that a few days after the shooting, he and his mother
spoke with a police artist, who prepared a composite
sketch. Kent testified, however, that the sketch did not
look like the assailant. Donna Van Zanten testified that
she and her son looked with the police for the assailant
on the day of the crime and that Detective McWeeny of
the Chicago police department showed her photo arrays
on three separate occasions, but that she was unable to
identify anyone in the photos.

Detective McWeeny testified for the State that he
brought Larry Stewart, one of the bystanders, to Area 1
Violent Crimes to look at photo books on March 29,
1985. Apparently, all previous photo arrays had been col-
lected from Area 2 Violent Crimes. Stewart looked
through a number of books and picked out Clarence
Hayes' photo. Detective McWeeny then obtained a more
recent photo of the defendant and assembled a photo ar-
ray for the other witnesses. According to Detective
McWeeny, bystander Harold Smith and Donna and Kent
Van Zanten identified the defendant's photograph from
this array.

Detective McWeeny testified that he went to Clarence
Hayes' home at 10727 South Indiana and asked an el-
derly man if he could speak to Clarence Hayes. The offi-
cer left his business card and asked the man to have
Clarence call him when he got home. Over defense objec-

tion, the officer testified that after making approximately six attempts to locate the defendant at his parents' home, the police obtained an arrest warrant and formed a stakeout at a currency exchange. The stakeout continued for four days until the defendant was apprehended on April 14, 1985.

The defendant was advised of his *Miranda* rights and placed in a lineup. The first lineup occurred in the early afternoon and was viewed by Donna and Kent Van Zanten, Harold Smith, and Larry Stewart. Detective McWeeny testified that each witness identified the defendant as the offender. A second lineup was conducted later that evening, after Roger Nelson and Sandra Wissink drove to Chicago from Michigan to view the lineup. Detective McWeeny testified that Roger and Sandra each identified the defendant from the lineup as the person who shot and killed Ronald Nelson. All six witnesses positively identified the defendant in court and testified at trial regarding their identification of the defendant in the photo array and the lineup.

Detective McWeeny was questioned by defense counsel on cross-examination regarding apparent discrepancies between the composite sketch drawn up by the police artist and the defendant's appearance. Detective McWeeny testified that the composite sketch of the offender included a description of the offender's face as "pockmarked." McWeeny acknowledged that the defendant's arrest report did not state that the defendant had "pockmarks." On redirect, Detective McWeeny explained that Larry Stewart told him that the assailant had little holes in his face around his beard. Detective McWeeny, who had a pockmarked face, asked Stewart if the indentations were "like mine," and Stewart said "kind of." Therefore, Detective McWeeny characterized the assailant as "pockmarked" in the composite description. Detective McWeeny testified that the term "pockmark"

was brought to Larry Stewart's attention only after Stewart told McWeeny that the assailant's face had indentations.

The parties stipulated that if Diane M. Scala-Barnett was called to testify, she would state that she is a doctor of pathology and performed an autopsy on Ronald Nelson. She would state that the 50-year-old victim died of a gunshot wound to the abdomen. Following this stipulation, the State rested and the trial court denied the defendant's motion for a directed verdict.

Edward Matthews, an investigator for the public defender's office, testified on the defendant's behalf. Matthews testified that on April 10, 1986, he and the defendant's trial counsel spoke to Harold Smith at Smith's home. According to Matthews, Harold would not allow the conversation to be recorded, but stated that he could not identify anyone when he viewed the lineup. Matthews testified that Smith told them that his attention was drawn to the defendant at the lineup because he was the tallest, was wearing a white shirt, and because there were handcuffs hanging on the wall directly behind him. According to Matthews, Smith stated that he did not identify the defendant in a photo array or the lineup until after he spoke with Larry Stewart and another nontestifying witness. On cross-examination, Matthews testified that he did not take notes of this conversation with Harold Smith.

The parties then stipulated that Terry Merriweather, who bore some resemblance to the defendant, was arrested after he was found near the currency exchange. It was further stipulated that Merriweather did not have pockmarks on his face and appeared to be cleaner in appearance than the defendant. The record also indicated that the police arrested a man named Everette Bakion, who was subsequently released because he did not have pockmarks on his face. Bakion was wearing a long coat

and had a Playboy bunny cap in his pocket at the time of his arrest. The defense then rested.

The trial court again denied the defendant's motion for a directed verdict. Following closing arguments and instructions to the jury, the jury found the defendant guilty of murder and armed robbery. The trial court denied the defendant's motion for a new trial and the case proceeded to the death penalty hearing.

At the eligibility stage of the death penalty hearing, the parties stipulated that the defendant was 34 years old at the time of the crimes. The trial judge determined that the defendant had murdered Ronald Nelson during the course of an armed robbery, and thus was eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). The court then heard evidence in aggravation and mitigation.

In aggravation, the State introduced certified copies of Clarence Hayes' prior convictions for armed robbery, burglary, forgery and attempted armed robbery. The victim of the attempted armed robbery testified at the sentencing hearing regarding the details of the crime.

The State also introduced evidence that the defendant attempted to rob a liquor store on the day Ronald Nelson was killed. Lavergne McDonald testified that on March 17, 1985, she was employed as a cashier at Fortenberry Liquors, located at 36 E. 111th Street in Chicago. At approximately 1:30 p.m. a man wearing a Playboy bunny cap pointed a gun at her and told her not to say anything. She screamed and ran across the store, and the offender fled. The witness testified that she went to the police station on April 14, 1985, and identified the defendant in a lineup as the would-be robber. Ms. McDonald also identified the defendant in court as the offender.

On cross-examination, Ms. McDonald testified that she had previously told defense counsel that the offender had pockmarks, but stated that she saw the offender for only three seconds. Ms. McDonald admitted that she had said that a photograph of Everette Bakion looked similar to the defendant. Ms. McDonald did not recall saying that she was uncertain of her identification of the defendant.

The State then introduced Roger Nelson's written victim impact statement into the record and called him as a witness. Roger Nelson testified about his personal unrest and about the nightmares he suffered after his father's murder. He testified that a sense of fear and mistrust plagued his wife and him. Nelson also told the court that his father would never know the child that he and his wife were going to have.

When asked about the crime's impact on his mother, Roger Nelson told the court that his mother was not the mother that he had as he was growing up. He testified that his parents had a beautiful 26-year marriage and remarked that he could never remember his parents fighting. After the crime, his mother moved from Iowa to Michigan to try to start a new life. He testified that Iowa had been his mother's home for 11 years, and described his mother's loneliness and her difficulty finding a job in Michigan. He stated that his mother had lost her closest and dearest friend. When asked what sentence Clarence Hayes should get, Roger expressed his belief that Hayes would kill again if given the chance. He concluded that he never wanted to know that the defendant was on the street again and never wanted any family to suffer as his family had suffered. Following Roger's testimony, the State rested.

The defense presented seven witnesses in mitigation. Edward Matthews, an investigator with the office of the public defender, testified that he interviewed Lavergne

McDonald in April 1986. Matthews testified that he showed McDonald a photograph of the lineup at which she identified the defendant as the man who tried to rob Fortenberry Liquors on the same day that Ronald Nelson was killed. Matthews testified that, although McDonald identified the defendant in the photograph, she was unsure of her identification. When he showed her a photograph of Everette Bakion, a suspect whose physical appearance and clothing matched that of the offender, she stated "this could be him."

Six witnesses testified regarding the defendant's character. Valerie Love testified that she was a friend of the defendant's and that he was a nice person and had been nice to her and her son. Jeanette Brown testified that she and the defendant were friends and that he was instrumental in getting her to seek treatment for her alcoholism. Ms. Brown admitted that she was aware of the defendant's narcotics addiction.

Alex Hayes, the defendant's brother and a Chicago police officer, testified that he had a nice relationship with his brother when they were growing up. Alex was aware of the defendant's background and after the defendant's release from the penitentiary, Alex tried to help him get work. In 1984, Alex and the defendant began a furniture manufacturing business together and the defendant worked long hours to get the business established. The defendant worked regularly until the time of his arrest.

On cross-examination, Alex acknowledged that when he applied for a job with the police department, he learned that Clarence had used his name in connection with a burglary arrest. He knew generally of Clarence's criminal convictions but did not remember the details. Finally, Alex testified that he was not involved in the investigation of Ronald Nelson's murder and that Clarence had not asked him to get involved.

James Hayes, the defendant's father, testified that the defendant was always telling other family members to stay in school and to stay away from gangs. Lois Hayes, the defendant's mother, testified that the defendant was an obedient son and got along well with family members and friends. Mrs. Hayes stated that the defendant was good with children and always helped out. Although she did not believe that the defendant committed the crimes, she expressed her sympathy to the Nelson family.

Charlotte Hayes, the defendant's sister-in-law, testified that the defendant was a good uncle and helped her raise her children after their father died. Rosie Jackson, a family friend, stated that the Hayes family was close-knit and religious. Jackson described how Clarence once went out of his way to help bail one of Jackson's grandsons out of jail.

Finally, the defendant told the court that he sympathized with the Nelsons because he too had lost family members. The defendant stated that he valued life and never hurt anyone. The defendant told the trial court that he also has nightmares, that he is not an evil man, but is a loving person, and that he did not take anyone's life.

Following closing arguments, the trial court weighed the aggravating and mitigating evidence. The court found that none of the mitigating factors listed in section 9—1(c) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)) applied to the defendant. The trial court found, however, that two of the mitigating factors set forth in section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.1) applied to the defendant, namely, hardship to dependents and a health or medical condition. The court then considered factors in aggravation and concluded that the defendant's criminal history classified him as a career

criminal. The court then noted that one statutory aggravating factor had not been mentioned, that being the statutory factor that allows consideration of the fact that the offense took place on the grounds of a place of worship immediately following worship services. The court then found that the fact that the victim had just left church was a factor in aggravation which applied to the present case. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(9).) Finally, the court remarked that the most important considerations were that it was convinced beyond reasonable doubt that the defendant committed the crime and that the crime was cruel, deliberate and indifferent. Finding no factors sufficient to preclude imposition of the death penalty, the court sentenced the defendant to death.

Defense counsel subsequently filed a petition for reconsideration of the death sentence. Among other things, defense counsel argued that use of the fact that the victim had just left church was impermissible under the eighth and fourteenth amendments. The court denied the post-sentencing motion. As stated, the defendant appealed directly to this court (107 Ill. 2d R. 315(a)).

## PRETRIAL ERRORS

### 1. Discovery

Initially, defendant contends that the trial court erred in ordering the defense to disclose to the State any potentially impeaching material contained in its investigator's notes. Prior to trial, the State filed a motion to discover any potentially impeaching material contained in the notes of Edward Matthews, the investigator retained by the public defender. At the hearing on the State's motion, the defendant objected to discovery on the ground that it deprived the defendant of the effective assistance of counsel. The trial court, relying upon this court's deci-

sion in *People v. Boclair* (1987), 119 Ill. 2d 368, and Supreme Court Rule 413(e) (107 Ill. 2d R. 413(e)), allowed the State's motion in part. The trial court ordered the defense to disclose only verbatim statements made by witnesses for the State to the defense investigator which contradicted statements those witnesses previously made to the police and the prosecuting attorney. In his post-trial motion, the defendant renewed his claim that the discovery order deprived him of the effective assistance of counsel. He also alleged, for the first time in the post-trial motion, that the discovery order violated his privilege against self-incrimination, due process, separation of powers, Illinois evidentiary law and his right of confrontation. The trial court denied this post-trial motion.

Although the defendant raises a number of objections to the discovery motion, we consider only his claim that the order deprived him of the effective assistance of counsel. The defendant waived his claims that the discovery order violated due process and his privilege against self-incrimination, by failing to object on those grounds at trial. (*People v. Johnson* (1987), 119 Ill. 2d 119, 138-39; see *People v. Boclair* (1989), 129 Ill. 2d 458, 480 (refusing to address due process claim on grounds of waiver, but holding that similar discovery order did not violate the defendant's privilege against self-incrimination).) The defendant also waived his claim that his investigator's notes were protected under the work-product doctrine by failing to raise that claim at trial and in his post-trial motion. *People v. Terrell* (1989), 132 Ill. 2d 178, 196; *People v. Enoch* (1988), 122 Ill. 2d 176, 186-88.

The defendant argues that the discovery order deprived him of the effective assistance of counsel because it effectively turned his investigator into an arm of the State. He claims that he suffered prejudice as a result of the discovery order because the State was able to prepare its witnesses to give vague answers to questions

during cross-examination by the defense. The defendant argues that, as a result, none of the State's witnesses would admit in court that the assailant, unlike the defendant, had a pockmarked face. The defendant also claims that one formerly cooperative witness, Larry Stewart, became hostile to the defense as a result of the discovery order.

In *People v. Boclair* (1987), 119 Ill. 2d 368 (*Boclair I*), this court recognized that ends of justice are best served by a system of liberal pretrial discovery which gives both the State and the defendant the maximum possible amount of information with which to prepare their cases. To facilitate pretrial discovery, Supreme Court Rule 413(e) (107 Ill. 2d R. 413(e)) gives courts limited discretion to order the defense to disclose relevant material to the State. The court in *Boclair I* held that the trial court did not abuse the discretion accorded it under Rule 413(e) when it ordered the defense to disclose those portions of its investigator's notes which recorded verbatim statements of State witnesses to the defense investigator. The court concluded that the investigator's notes were material and relevant to the legitimate ends of discovery, because the notes prevented the State from being surprised by the inconsistent statements of its witnesses. In addition, the notes allowed the State to prepare for impeachment, to rehabilitate its witnesses and to restructure its case if necessary. (*Boclair I*, 119 Ill. 2d at 375.) Accordingly, disclosure of the defense investigator's notes served the legitimate ends of discovery, by promoting the search for truth and reducing the possibility of surprise at trial. *Boclair I*, 119 Ill. 2d at 375.

In *People v. Boclair* (1989), 129 Ill. 2d 458 (*Boclair II*), this court considered whether the same discovery order violated the defendant's right to the effective assistance of counsel. We held that the discovery order did not

deprive the defendant of the effective assistance of counsel because the trial court ordered the defense to disclose only those portions of the investigator's notes which contained factual statements which could fairly be said to be the actual words of the prosecution witnesses. Our decision in *Boclair II* is controlling here.

The defendant here, like the defendant in *Boclair II*, relies upon *State v. Williams* (1979), 80 N.J. 472, 404 A.2d 34, and a footnote in *Weatherford v. Bursey* (1977), 429 U.S. 545, 554 n.4, 51 L. Ed. 2d 30, 39 n.4, 97 S. Ct. 837, 843 n.4, to support his contention that ordering the defense to disclose portions of its investigator's notes violates the effective assistance of counsel guarantee. As the *Boclair II* court noted, however, neither *Williams* nor *Weatherford* supports the claim that the discovery order was improper. *Williams* held that it was improper to require the defense to disclose inculpatory material uncovered by the defense. The discovery order at issue here did not require the defense to turn over inculpatory material to the State. The defendant's reliance upon the *Weatherford* footnote is similarly misplaced. The *Weatherford* footnote specifies that the sixth amendment's assistance of counsel guarantee requires that communications between a criminal defendant and his attorney be protected from discovery. The footnote in *Weatherford* does not state or suggest that communications between third parties, such as an investigator and a potential witness, are protected from discovery. *Boclair II*, 129 Ill. 2d at 480-82.

This case is distinguishable from *Boclair II* in one respect: the trial court here, unlike the trial court in *Boclair II*, did not conduct an *in camera* inspection of the investigator's notes before ordering the defense to disclose them. The discovery order here, however, was more restrictive than that in *Boclair II*, and an *in camera* inspection was not necessary to safeguard the

defendant's right to the effective assistance of counsel. In *Boclair II*, the trial judge initially ordered the defense to disclose its investigator's notes of interviews with prosecution witnesses in their entirety. When defense counsel refused to comply with the order, the court conducted an *in camera* inspection of the notes and excised irrelevant and privileged material. Here, on the other hand, the trial court ordered the defense to disclose only those statements made by State witnesses to the investigator which impeached statements those witnesses had already made and which were of record in police reports, transcripts or prosecution summaries. Here, as in *Boclair II*, the defendant was obligated to disclose only those statements of State witnesses to the investigator which could fairly be said to be the witnesses' own words. Accordingly, we conclude that the order did not deprive the defendant of the effective assistance of counsel. *Boclair II*, 129 Ill. 2d at 480-82.

Moreover, even if we agreed with the defendant's claim that the discovery order was improper, we fail to see how the defendant was prejudiced by the order. The discovery order required the defense to disclose impeaching statements Harold Smith and Larry Stewart made to the defense investigator. The record demonstrates, however, that the defense did not fully comply with this order. Defense counsel cross-examined Harold Smith at trial with statements Smith allegedly made to the defense investigator prior to trial and which contradicted Smith's testimony at trial. The State objected to the cross-examination on the ground that the defense had failed to disclose Smith's impeaching statements to the State, as required by the discovery order. The trial court acknowledged that the defense had failed to fully comply with the discovery order but declined to limit the defendant's cross-examination of Smith. Thus, the discovery or-

der did not prejudice the defendant's ability to impeach Smith.

The defendant's claim that he was prejudiced by the discovery order because the witnesses would not admit that the assailant had a pockmarked face is also unpersuasive. The record shows that Larry Stewart testified at trial that he told the police that the assailant had a pockmarked face. Accordingly, the defendant was not prejudiced by the discovery order.

## 2. Grand Jury

The defendant next argues that he was denied a fair trial because the State misused the grand jury procedure to depose potential defense witnesses without according reciprocal discovery to the defense. Prior to trial, the defendant filed a motion seeking to depose the State's witnesses. At the hearing on the motion, the defendant argued that the State improperly called several of his family members to testify before the grand jury, even though none of them could offer any information which the grand jury could use to indict the defendant. He argued that the State's only purpose for calling his family members was to record minor inconsistencies in their testimony for impeachment purposes in the event that the defendant offered an alibi defense at trial. He also argued that this abuse of the grand jury process gave the State an unfair advantage over the defense, because the State was able to depose defense witnesses, while most of the State's witnesses refused to speak to defense counsel. The defendant argued that, because the State used the grand jury process to depose potential defense witnesses, he should be allowed to depose State witnesses prior to trial. The trial court denied the defendant's motion, holding that the taking of discovery depositions was not authorized by statute or rule.

The defendant raises these same arguments in this appeal. In addition, he argues that the State's abuse of the grand jury procedure induced him to abandon his alibi defense and thereby caused him prejudice. He claims that the only appropriate way to remedy the State's failure to give reciprocal discovery to the defendant is to grant him a new trial. We disagree.

The record shows that six members of the defendant's family were called to testify before the grand jury regarding the defendant's whereabouts on the day of the crime. The prosecutor told the grand jury that the family members were called solely for information purposes. Five family members testified on April 23, 1985, the day that the grand jury returned a true bill against the defendant. The witnesses all testified under oath that the defendant was at home watching the Memphis State basketball game between noon and 2 p.m. on March 17.

We cannot agree with the defendant that the prosecutor acted improperly in calling these family members to testify before the grand jury. The purpose of the grand jury's investigation is not only to cause the prosecution of the guilty, but also to protect the innocent from unfounded criminal prosecutions. (*Branzburg v. Hayes* (1972), 408 U.S. 665, 33 L. Ed. 2d 626, 92 S. Ct. 2646; *People v. Rodgers* (1982), 92 Ill. 2d 283.) Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, the grand jury must have the opportunity to examine all witnesses and to conduct a thorough investigation. (Ill. Rev. Stat. 1985, ch. 38, par. 112—4(b) ("The Grand Jury has the right to subpoena and question any person against whom the State's Attorney is seeking a Bill of Indictment, or any other person").) In view of the fact that the defendant's family members supplied the defendant with an alibi, their testimony was properly introduced so

that the grand jury could ascertain whether the defendant had an opportunity to commit the crimes in question.

Two days after the grand jury returned a true bill, however, the defendant's mother was called to testify before the grand jury "for informational purposes." We agree with the defendant that, in the circumstances here, the State acted improperly in calling a witness to testify before the grand jury after the indictment against the defendant was returned. The record does not support the defendant's claim, however, that this error so prejudiced the defendant that he is entitled to a new trial. The testimony of the defendant's mother was similar to the grand jury testimony properly elicited from five other members of the defendant's family. In view of the fact that evidence regarding the defendant's whereabouts at the time of the crime was properly introduced to the grand jury, we fail to see how the defendant was prejudiced when his mother made substantially similar statements to the grand jury.

We also disagree with the defendant's claim that the trial court improperly denied his motion to depose the State's witnesses. The defendant argues that the State received substantially greater discovery than the defendant, because the State was able to depose defense witnesses before the grand jury, while defense counsel was unable to persuade witnesses for the State to speak to him. The defendant argues that, in the interests of reciprocal discovery, the trial court should have allowed him to depose the State's witnesses. He argues that the failure to accord reciprocal discovery rendered his trial fundamentally unfair and in violation of due process.

The defendant improperly characterizes the testimony of the defendant's family members before the grand jury as a "deposition." The State did not depose the defense witnesses before the grand jury. Rather, it introduced their testimony so that the grand jury could determine

whether the defendant had an opportunity to commit the offense under investigation. Furthermore, witnesses for the State are under no obligation to grant an interview to defense counsel (*People v. Peter* (1973), 55 Ill. 2d 443, 451; *People v. Touhy* (1935), 361 Ill. 332, 348), and such refusal does not warrant the taking of their depositions. Supreme Court Rule 414 (107 Ill. 2d R. 414) authorizes the taking of a deposition of a witness in a criminal case only if it is necessary to preserve the testimony because of the substantial possibility that the testimony will be unavailable at the time of trial. The defendant here did not allege that the witnesses he sought to depose would be unavailable at the time of trial. Rather, he simply argued that depositions were appropriate because defense counsel was unable to persuade the State's witnesses to speak to him or to give him sworn statements. The trial court did not err in refusing to order discovery depositions of the State's witnesses on this ground.

### 3. Sixth Amendment Right to Counsel at a Lineup

The defendant next argues that he was deprived of his sixth amendment right to have counsel present at the lineups at which he was identified by witnesses for the State. An application for the issuance of an arrest warrant in the form of a complaint for preliminary examination charging the defendant with attempted armed robbery of Fortenberry Liquors on March 17, 1985, was sworn to and filed by a police officer. The State's Attorney's office reviewed the form of the application and approved the issuance of an arrest warrant. The police officer then presented the complaint to a circuit court judge, who issued a warrant for the defendant's arrest. The defendant was arrested four days later and was immediately placed in a lineup, where he was identified by Lavergne McDonald as the person who attempted to rob the liquor store where she was employed. He was also

identified by six eyewitnesses as the person who shot and killed Ronald Nelson.

The defendant maintains that the filing of a complaint for preliminary examination charging him with attempted armed robbery and the issuance of an arrest warrant constituted a "formal charge" and marked the beginning of adversarial proceedings against him, thereby triggering his right to have counsel present during the lineup. The State responds that the act of filing a complaint on an unrelated charge does not indicate that the State has made a commitment to prosecute the defendant for a charge not specified in that complaint.

A person's sixth amendment right to counsel attaches only after adversary judicial criminal proceedings have been initiated against him, whether by way of a formal charge, preliminary hearing, indictment, information, or arraignment. (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882; see also *Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239.) The sixth amendment's right to counsel guarantee assures that the accused receives the assistance of counsel when confronted with "the intricacies of the law and the advocacy of the public prosecutor" at trial. (*United States v. Ash* (1973), 413 U.S. 300, 309, 37 L. Ed. 2d 619, 626, 93 S. Ct. 2568, 2573.) It also ensures that the defendant receives the assistance of counsel at certain "critical" preindictment proceedings, where the accused is confronted by the procedural system, an expert adversary or both, and where the results of the confrontation might determine the defendant's fate and make the trial itself a mere formality. (*United States v. Ash* (1973), 413 U.S. 300, 309, 37 L. Ed. 2d 619, 626, 93 S. Ct. 2568, 2573; *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882; *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926.) The Su-

preme Court has recognized that it is only after the initiation of judicial criminal proceedings that "the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 418, 92 S. Ct. 1877, 1882; *Maine v. Moulton* (1985), 474 U.S. 159, 172-73, 88 L. Ed. 2d 481, 493-94, 106 S. Ct. 477, 485.

The United States Supreme Court has not yet decided whether the sixth amendment right to counsel attaches automatically upon the filing of a criminal complaint. (See *United States v. Gouveia* (1984), 467 U.S. 180, 189-90, 81 L. Ed. 2d 146, 155-56, 104 S. Ct. 2292, 2298-99.) This court, however, has considered the issue on several occasions. In *People v. Owens* (1984), 102 Ill. 2d 88, the court observed that "there is respectable authority that whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement." (*Owens*, 102 Ill. 2d at 101, citing *State v. Johnson* (Iowa 1982), 318 N.W.2d 417, 435 (while the filing of a simple complaint by or at the direction of the prosecutor may constitute the initiation of adversarial proceedings, the filing of such a complaint by a police officer in order to secure an arrest warrant, with no indication of prosecutorial involvement, does not necessarily have a similar effect).) The *Owens* court found it unnecessary to decide under the facts of that case whether the right to counsel attaches with the filing of a criminal complaint for the purpose of obtaining an arrest warrant.

In *People v. Wilson* (1987), 116 Ill. 2d 29, 50-51, this court held that the filing of a complaint by a police officer to obtain a warrant for the defendant's arrest did

not signal the initiation of adversarial proceedings against the defendant. In so holding, the court emphasized that the complaint for an arrest warrant was presented to the judge *ex parte*, that the complaint was presented by a police officer rather than an assistant State's Attorney, and that the complaint was not filed until after the defendant appeared in the lineup. In such circumstances, the court concluded that the procedure did not initiate adversarial proceedings against the defendant.

In *People v. Thompkins* (1988), 121 Ill. 2d 401, this court again indirectly addressed the issue when considering whether a defendant's sixth amendment right to counsel had attached at the time he was interrogated by and confessed to the police. The court held that the defendant's sixth amendment right to counsel had not attached following his arrest pursuant to an arrest warrant, because adversary judicial proceedings had not been initiated against him. The court noted that only a complaint for preliminary examination charging the defendant with murder had been issued and the defendant had been neither indicted nor arraigned. The court stated that the complaint did not constitute a commitment by the People to prosecute the defendant, and that the defendant's sixth amendment right to counsel therefore had not attached at the time he was interrogated and confessed.

*Owens, Thompkins* and *Wilson* demonstrate that, in determining whether an accused's sixth amendment right to counsel attaches upon the filing of a criminal complaint, the court must consider the degree to which the State's prosecutorial forces have focused upon the accused. The prosecutor here, unlike *Owens* and *Thompkins*, reviewed the criminal complaint against the defendant before it was filed in the circuit court. The prosecutor's involvement in the procurement of the war-

rant, however, was not significant and did not signal a commitment by the State to prosecute the defendant. The complaint for preliminary examination was presented in an *ex parte* proceeding by a police officer, rather than an assistant State's Attorney. Moreover, the complaint for preliminary examination, upon which the warrant issued, charged the defendant with the offense of attempted armed robbery of Fortenberry Liquors on March 17, 1985, rather than the murder of which the defendant was ultimately convicted. We agree with the State that the filing of a complaint and the issuance of an arrest warrant for one criminal charge (attempted armed robbery) does not indicate that the State was committed to prosecute the defendant for another unrelated murder charge not specified in that complaint. (See *People v. Logan* (1983), 117 Ill. App. 3d 753, 759.) The fact that a warrant was obtained prior to the defendant's arrest was not sufficient to create trial-like confrontation contemplated by the sixth amendment. (*People v. Boswell* (1985), 132 Ill. App. 3d 52, 59-60.) Absent proof of significant prosecutorial involvement in procuring the arrest warrant, we conclude that the defendant's sixth amendment right to counsel had not attached as to the murder charge at the time of the lineup. *People v. Evans* (1988), 125 Ill. 2d 50, 78 (the sixth amendment right to counsel does not attach until the commencement of adversarial judicial criminal proceedings even if the defendant's right to counsel has attached to an unrelated charge); *People v. Boswell* (1985), 132 Ill. App. 3d 52 (prosecutor's review of a complaint was insufficient, by itself, to trigger defendant's sixth amendment right to counsel at a lineup).

## 4. Arrest Warrant

The defendant next argues that his conviction must be reversed because the arrest warrant charging him

with attempted armed robbery failed to state any facts showing circumstances from which probable cause could be determined. He argues that, because of the defect in the warrant, his arrest was invalid and the lineup identifications obtained as a result of the unlawful arrest were improperly admitted into evidence at trial.

Both the fourth amendment of the United States Constitution and article II, section 6, of the Illinois Constitution provide that no warrant will issue without probable cause. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.) The basic purpose of the arrest warrant requirement is to interpose, prior to an arrest, a neutral magistrate's review of the factual justification for the charges. (*People v. Wolgemuth* (1977), 69 Ill. 2d 154, 161.) Thus, before issuing an arrest warrant, the judicial officer must be supplied with sufficient information to make an independent judgment that probable cause exists. (*Whiteley v. Warden* (1971), 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031.) Neither the Federal Constitution nor the Illinois Constitution, however, specifies the form or manner in which probable cause must be shown.

Section 107—9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 107—9) implements the constitutional requirement that warrants may issue only upon a showing of probable cause, and sets out the requirements for issuance of an arrest warrant. That section specifies that when a complaint is presented to a court charging that an offense has been committed, the court shall examine upon oath or affirmation the complainant or any witnesses. (Ill. Rev. Stat. 1985, ch. 38, par. 107—9(a).) It further states that the complaint must be in writing, subscribed and sworn by the complainant and must state the name of the accused, the offense charged and the time and place of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 107—9(b).) Finally, the section states that a warrant shall be issued by the court

for the arrest of the person complained against if it appears from the contents of the complaint and the examination of the complainant or other witnesses that the person against whom the complaint was made has committed an offense. Ill. Rev. Stat. 1985, ch. 38, par. 107—9(c).

The complaint for the arrest warrant in this case satisfied the requirements of section 107—9(b). The complaint was signed and sworn to by Detective McWeeny, and alleged that the defendant:

> "[C]ommitted the offense of attempt armed robbery in that he with the intent to commit the offense of armed robbery pointed a gun at Lavergne McDonald and demanded money from the cash register of Fortenberry Liquors which constitutes a substantial step toward the commission of armed robbery."

The complaint contains the name of the accused, the offense charged, the time and place of the offense and the signature and oath of the complainant, as required by section 107—9.

In determining whether probable cause existed for the defendant's arrest, the judge was not limited to the facts alleged in the four corners of the complaint. (*People v. Collins* (1979), 70 Ill. App. 3d 413.) The judge issuing the warrant for the defendant's arrest was required by statute to examine the complainant or witness under oath, and may have legitimately based his determination of probable cause upon this required examination. The defendant argues that there is no evidence that the judge who signed and issued the warrant for his arrest examined the complainant or witnesses in compliance with section 107—9(a). On the contrary, the judge who issued the warrant attested on the face of the complaint that he had examined the complaint and the person presenting the complaint and, having heard the evidence, was satisfied that there was probable cause for the

defendant's arrest. It is evident from this language that the judge properly examined the complaint and the complainant and determined that probable cause existed, before issuing a warrant for the defendant's arrest. This independent examination of the facts showing probable cause is what the Constitution requires. (*Whiteley v. Warden* (1971), 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031; *People v. Wolgemuth* (1977), 69 Ill. 2d 154.) The fact that the complaint itself may not have stated facts supporting probable cause did not make the warrant invalid. *People v. Hooper* (1989), 133 Ill. 2d 469 (section 107—9 does not require that the complaint or arrest warrant actually articulate probable cause on its face; the court may base its probable cause determination upon its examination of the complainant or of any witness under oath); *People v. Collins* (1979), 70 Ill. App. 3d 413.

*People v. Waitts* (1967), 36 Ill. 2d 467, upon which the defendant relies, is distinguishable. In *Waitts*, an arrest warrant was issued solely on the basis of a complaint which did not show probable cause on its face, but stated only that the complainant had "just and reasonable grounds" to believe that a person committed an offense. In addition, there was no indication that the judge looked beyond the face of the complaint or examined the complainant or any witnesses to determine whether probable cause existed. The *Waitts* court held that the warrant was invalid because the judge had issued the warrant without making any independent determination of probable cause. Here, on the other hand, the arrest warrant was not issued solely on the basis of the complaint; the trial court examined the complainant under oath and determined that probable cause existed. Accordingly, we reject the defendant's claim that the arrest warrant was constitutionally defective.

## TRIAL ERRORS

### 1. Argument that Police Failed to Apprehend Him

The defendant also argues that a number of errors occurred at his trial which require that his conviction be reversed. He first claims that he was denied a fair trial when one of the State's witnesses testified that the police tried for two weeks, without success, to apprehend him. Detective McWeeny testified at trial that he made six attempts to locate the defendant at his home, that he obtained a warrant for the defendant's arrest and set up a stakeout at a currency exchange, and that the defendant was arrested several days later. The defendant argues that this testimony deprived him a fair trial because it suggested that he intentionally avoided arrest, even though there was no evidence that he knew he was wanted for questioning and consciously avoided the police.

It is within the discretion of the trial court to decide whether evidence is relevant and admissible and its decision will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. (See *People v. Johnson* (1987), 116 Ill. 2d 13, 24; *People v. Johnson* (1986), 114 Ill. 2d 170, 193.) The trial court here determined that McWeeny's testimony was relevant to describe the circumstances leading up to the defendant's arrest. We conclude that the trial court did not abuse its discretion in admitting such evidence.

The consequential steps in the investigation of a crime and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case to the trier of fact. (*People v. Johnson* (1986), 114 Ill. 2d 170, 194.) Here, the evidence established that on March 29, 1985, Larry Stewart identified the defendant in a photograph as the assailant.

Other evidence informed the jury that the defendant was not arrested and identified by other witnesses until April 14, 1985. Detective McWeeny's testimony was relevant to explain the two-week delay between Larry Stewart's identification and the defendant's arrest. Testimony that the police were unable to find the defendant was part of the narrative of police activities leading to the defendant's arrest and was intertwined with the circumstances of the arrest. The testimony was, therefore, properly admitted. *People v. Chambers* (1989), 179 Ill. App. 3d 565; *People v. Rockman* (1986), 144 Ill. App. 3d 801; *People v. McNair* (1981), 102 Ill. App. 3d 322, 332; *People v. McShan* (1975), 32 Ill. App. 3d 1068.

The defendant argues that this court held in *People v. Richardson* (1988), 123 Ill. 2d 322, that evidence such as Detective McWeeny's testimony is not admissible merely to show how an investigation unfolded or to explain the circumstances leading up to a defendant's arrest. We disagree. In *Richardson*, the State introduced evidence at the defendant's murder trial which showed that the defendant was arrested while committing an unrelated armed robbery. This court held that evidence that the defendant committed a crime other than that for which he was being tried is not admissible simply to show how the investigation unfolded and how the defendant came into custody. *Richardson* simply applied the generally recognized principle that "other-crimes" evidence is not admissible in a criminal case unless it is relevant to prove that the defendant committed the crime at issue. (*Richardson*, 123 Ill. 2d at 342; see also *People v. Spiezio* (1982), 105 Ill. App. 3d 769.) Here, unlike *Richardson*, the State did not introduce evidence that the defendant committed other, unrelated crimes. It simply introduced relevant evidence of the events leading up to the defendant's arrest. We conclude that the trial

court did not abuse its discretion in permitting Detective McWeeny to testify as to the course of his investigation.

We do not agree, however, with the trial court's conclusion that evidence that the police did not apprehend the defendant for two weeks was relevant because it raised an inference that the defendant intentionally concealed himself from police. Evidence of intentional concealment is relevant and admissible as a circumstance tending to show consciousness of guilt. The inference of guilt that may be drawn from such evidence, however, depends upon the defendant's knowledge that a crime has been committed and that he is suspected of committing it. (*People v. Harris* (1961), 23 Ill. 2d 270, 273; *People v. Maldonado* (1971), 3 Ill. App. 3d 216.) In this case, there were no facts from which the jury could validly infer that the defendant knew he was a suspect and consciously avoided the police. The evidence at trial showed only that Detective McWeeny went to the defendant's home and asked to speak with the defendant, left his business card and phone number and returned a number of times in an effort to locate the defendant. There was no evidence that the defendant received the police officer's business card or was ever informed by family members that the police were looking for him. In fact, there was no evidence that the defendant was living at his parents' home prior to his arrest. In such circumstances, we conclude that evidence that the defendant did not telephone Detective McWeeny and was not home when Detective McWeeny arrived does not support an inference that the defendant consciously avoided apprehension. Therefore, we conclude that the evidence was not admissible to show that the defendant consciously avoided arrest. As stated, however, the evidence was properly admitted to describe the circumstances of the defendant's arrest.

## 2. Fifth Amendment—Prearrest Silence

In a related argument, the defendant claims that testimony that the police tried for two weeks, without success, to apprehend him violated his fifth amendment right not to incriminate himself. He argues that the State may not penalize his failure to turn himself in to the police by urging the jury to view his conduct as evidence of guilt.

The defendant here basically argues that the fifth amendment prohibits the prosecution from commenting upon a suspect's prearrest, pre-*Miranda* silence. Neither the United States Supreme Court nor this court has considered whether the prosecution's reference to a suspect's prearrest, pre-*Miranda* silence in its case in chief violates the fifth amendment. The United States Supreme Court has held that the fifth amendment forbids the prosecutor from commenting upon the defendant's failure to testify at trial and from advising the jury that such silence is evidence of guilt. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) The Court has also held that the fifth amendment prohibits the prosecution from impeaching a defendant who testifies at trial with his post-arrest, post-*Miranda* silence. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.) The Court held that silence following *Miranda* warnings is insolubly ambiguous, because it may have been the result of being warned not to speak. The Court also concluded that the *Miranda* warnings carry an implicit assurance to a suspect that his silence will not be used against him. *Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244; *cf. Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124 (which held that neither the fifth amendment nor the fourteenth amendment bars the prosecution from us-

ing a defendant's prearrest, pre-*Miranda* silence to impeach the defendant's exculpatory testimony at trial).

Citing *Griffin* and *Doyle*, the defendant claims that the fifth amendment also prohibits the prosecutor from implying that the defendant's failure to turn himself in to police is evidence of his guilt. We need not decide the question here, however, because the defendant waived his right to raise the alleged error in this appeal. This court has recently affirmed that both an objection at trial and a specific objection in a written post-trial motion are necessary to preserve an issue for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 187; *People v. Johnson* (1987), 119 Ill. 2d 119, 131.) Here, the defendant's post-trial motion does not specifically allege that testimony that the police tried without success to apprehend him violated his fifth amendment privilege against self-incrimination. Accordingly, the defendant waived the issue by failing to specifically raise it in his post-trial motion. *People v. Terrell* (1989), 132 Ill. 2d 178, 197; *People v. Caballero* (1984), 102 Ill. 2d 23, 31; see *People v. Lucas* (1981), 88 Ill. 2d 245.

Moreover, even if we assume, *arguendo*, that the prosecutor's comments were improper, we conclude that any resulting error was harmless beyond a reasonable doubt. In a case involving a comment on the defendant's failure to testify, the Supreme Court admonished courts to "consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." (*United States v. Hastings* (1983), 461 U.S. 499, 509, 76 L. Ed. 2d 96, 106, 103 S. Ct. 1974, 1980.) The Court stated that the dispositive question is whether, absent the prosecutor's allusion, it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty. (*Hastings*, 461 U.S. at 510, 76 L. Ed. 2d at 107, 103 S. Ct. at 1981.) In this case, it is beyond doubt that the verdict would have been the same,

even if the prosecution had not alluded to the defendant's failure to turn himself in prior to his arrest. The prosecutor did not emphasize or highlight the defendant's failure to cooperate with the police. Nor was the alleged error so substantial as to carry a high risk of prejudice. The prosecutor's references to the defendant's prearrest silence were meant to explain the sequence of events leading up to the defendant's arrest, rather than to imply guilt. Furthermore, the evidence of the defendant's guilt was overwhelming. Six credible eyewitnesses positively identified the defendant in court as the person who robbed and murdered Ronald Nelson. These witnesses also had previously identified the defendant in a lineup and in photo arrays. Each witness viewed the assailant under conditions permitting a reliable identification. In view of the overwhelming identification evidence, we conclude that any error in referring to the defendant's failure to turn himself in to the police was harmless. See *Fencl v. Abrahamson* (7th Cir. 1988), 841 F.2d 760; *United States ex rel. Savory v. Lane* (7th Cir. 1987), 832 F.2d 1011; *United States v. Blanton* (11th Cir. 1984), 730 F.2d 1425; *United States v. Caro* (2d Cir. 1981), 637 F.2d 869.

### 3. Fourth Amendment

In a similar vein, the defendant contends that his fourth amendment right to be free from warrantless, nonconsensual home arrests was violated by testimony and prosecutorial comments that the police were forced to secure a warrant for his arrest when he did not turn himself in to the authorities. The defendant claims that the prosecutor's comments invited the jury to view the fact that the police obtained a warrant for his arrest as evidence of his guilt. He also contends that the evidence of an arrest warrant was irrelevant, since no warrant was necessary to secure his arrest on a public street.

The State responds that the defendant's claim is without merit since the fourth amendment protects against unreasonable searches and seizures, and does not forbid testimony that a warrant was obtained for the defendant's arrest.

We conclude that the disputed testimony was not improper. Evidence that a warrant was obtained for the defendant's arrest was relevant, even though the defendant's arrest outside a currency exchange could have been executed without a warrant. As stated, there was a significant period of delay between the time the defendant was identified as the offender and his arrest. Testimony that an arrest warrant was obtained, like the testimony that the police attempted to find the defendant at his home, was relevant to account for this period of delay. The issuance of a warrant for the defendant's arrest was part of the narrative of police activities leading to the defendant's arrest and was intertwined with the circumstances of the arrest. Testimony that an arrest warrant was issued was therefore properly admitted. *People v. Chambers* (1989), 179 Ill. App. 3d 565, 583-84; *People v. McNair* (1981), 102 Ill. App. 3d 322, 332; see also *People v. Johnson* (1986), 114 Ill. 2d 170, 194; *cf. People v. Wilson* (1987), 116 Ill. 2d 29, 52 (evidence that the police obtained an arrest warrant for an offense the defendant committed prior to the offense for which he was being tried was improper).

*People v. Meredith* (1980), 84 Ill. App. 3d 1065, upon which the defendant relies, does not support his claim that the testimony was improper. In *Meredith*, the prosecutor argued that the defendant knew he was guilty of the crimes charged because he contacted his attorney the day after the crime was committed and before he turned himself in to the police. The court concluded that the prosecutor improperly penalized the defendant's right to seek the assistance of counsel, by urging the

jury to view the defendant's constitutionally protected conduct as evidence of his guilt. Here, on the other hand, the prosecutor introduced testimony relating to the arrest warrant to explain the conduct of the police, not the defendant. The prosecutor did not invite the jury to infer that the defendant was guilty because the police obtained a warrant for his arrest. Rather, the testimony regarding the warrant was introduced simply to explain the circumstances leading up to the defendant's arrest. The fourth amendment does not bar the introduction of such testimony.

### 4. Nonidentification Testimony

The defendant next contends that he was deprived of a fair trial when four prosecution witnesses testified that they viewed pictures of persons other than the defendant and made no identification. Donna Van Zanten testified that she rode around with the police on the day of the shooting but did not see the offender. She also testified that she viewed photographs at the police station and viewed photo arrays on three separate occasions but was unable to identify anyone. Kent Van Zanten likewise testified that he rode around with the police and looked through numerous photo books on the day of the shooting and that he identified the defendant several weeks later. Roger Nelson also testified that he looked through photo books for hours at the police station on the day of the shooting. Finally, Larry Stewart testified that he looked at "picture books" all day at the police station but made no identification.

The defendant submits that such evidence was irrelevant and highly prejudicial. He argues that testimony that the witnesses viewed pictures of persons other than the defendant and made no identification was no more relevant than evidence that the witnesses did not view the defendant at an athletic event or shopping mall. He

argues that the testimony did not make it more probable that he was the offender or make the witnesses' identification of him more reliable, since there was no evidence that the witnesses did not identify persons with features similar to those of the defendant.

We agree with the defendant that testimony that witnesses identified only the defendant from photo arrays or books was improperly admitted. This testimony violated the general rule that a witness, although present in court and subject to cross-examination, may not testify as to statements he made out of court for the purpose of corroborating his testimony given at trial relative to the same subject. (*People v. Clark* (1972), 52 Ill. 2d 374, 388-90; see also *People v. Shum* (1987), 117 Ill. 2d 317, 339-41.) An exception to this rule is recognized where the prior consistent statement is introduced to rebut a charge or inference that the witness is motivated to testify falsely or that his in-court testimony is of recent fabrication. (*People v. Clark* (1972), 52 Ill. 2d 374, 388-90.) This exception does not apply here because the defendant did not expressly or impliedly charge that the State's witnesses were motivated to falsely identify him. The defendant simply attempted to show that the witnesses may have mistakenly identified him.

Another exception to the general rule that witnesses may not testify as to statements made out of court to corroborate their testimony at trial is recognized where the out-of-court statement is one of identification. (*People v. Rogers* (1980), 81 Ill. 2d 571, 578-79; Ill. Rev. Stat. 1985, ch. 38, par. 115—12.) The statements here were not admissible under this exception, however, because they were not statements of identification. Rather, the witnesses testified that they did not identify the defendant from the police photo books and the photo arrays in question. The State improperly introduced these prior consistent statements to bolster the reliability of the wit-

nesses' subsequent lineup and in-court identifications of the defendant. *People v. Hayes* (1988), 168 Ill. App. 3d 816; *People v. Trass* (1985), 136 Ill. App. 3d 455.

Although we conclude that the evidence that witnesses failed to identify persons other than the defendant was improperly admitted, we do not agree with the defendant that this "nonidentification" testimony was so prejudicial that it deprived him of a fair trial. In view of the overwhelming evidence of the defendant's guilt, we conclude that the error was harmless. Six witnesses identified the defendant in court as the offender. In addition, all of the witnesses had identified the defendant prior to trial in a lineup and four witnesses chose the defendant's photograph from a police photo array. Furthermore, each witness viewed the defendant at the time of the crime under circumstances permitting a positive identification. The positive identifications of six eyewitnesses overwhelmingly established the defendant's guilt. See *People v. Hayes* (1988), 168 Ill. App. 3d 816 (testimony that prosecution witnesses looked through many police photo books without identifying anyone was harmless in light of overwhelming identification of defendant in photo array, in lineup and at trial); see also *People v. Trass* (1985), 136 Ill. App. 3d 455 (police officer's testimony that victim did not identify anyone in two lineups that did not include the defendant, but did identify him in a subsequent lineup, was inadmissible but did not prejudice the defendant).

### 5. Hearsay Identification Testimony

The defendant next contends that certain hearsay testimony of Detective McWeeny deprived him of a fair trial. Detective McWeeny testified that he asked each witness who viewed the lineup and identified the defendant, "Are you positive?" and each witness responded, "Yes, I am." The defendant argues that Detective

McWeeny improperly characterized the witnesses' out-of-court identifications as reliable.

In *People v. Rogers* (1980), 81 Ill. 2d 571, this court held that a third person, such as a police officer, may testify that another witness made an out-of-court identification of the defendant when that witness also testifies at trial concerning that identification and is subject to cross-examination. The court held, however, that evidence of such out-of-court identification should be used only to corroborate the witnesses' in-court identification and not as substantive evidence. (*Rogers*, 81 Ill. 2d at 579.) Subsequently, the legislature enacted section 115—12 of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 115—12), which expanded the permissible use of testimony that a witness made an out-of-court identification. Under section 115—12, a witness' prior statement of identification is admissible as substantive evidence in a criminal trial when testified to by the witness or by a third person, such as a police officer, who was present when the witness made the identification.

The defendant concedes that, under section 115—12, Detective McWeeny could properly testify that Roger Nelson, Sandra Wissink Nelson, Larry Stewart, Donna Van Zanten, Kent Van Zanten and Harold Smith identified him in a lineup prior to trial. This testimony was admissible as substantive evidence or to corroborate the witnesses' testimony that they identified the defendant in the lineup.

The defendant argues, however, that section 115—12 only authorizes the introduction of testimony that a witness identified a person after viewing him. He argues that section 115—12 does not permit a witness to embellish the fact that an identification was made with hearsay testimony that the witness was positive of its accuracy. Thus, he claims that Detective McWeeny's testimony that every witness responded affirmatively

when asked whether they were certain of their identifications of the defendant was improper. But see *People v. Page* (1987), 163 Ill. App. 3d 959 (where the declarant is unable to reiterate circumstances surrounding the initial identification, a police officer or other party who observed the declarant make the identification may testify to specific details).

Again, however, the defendant waived his right to raise the error as a ground for reversal in this appeal by failing to object to the testimony at trial. (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 262.) We are not persuaded by the defendant's claim that Detective McWeeny's isolated remark should be regarded as plain error. The evidence at trial was not closely balanced. (See 107 Ill. 2d R. 615(a).) Six credible eyewitnesses positively identified the defendant prior to trial and in court as the offender. All of the witnesses viewed the defendant under conditions permitting a reliable identification. The evidence of the defendant's guilt was convincing.

Moreover, even if we agreed with the defendant that McWeeny's statements were improper, we would conclude that the error was not so prejudicial that it threatened to deprive the defendant of his right to a fair trial. The prosecutor did not emphasize McWeeny's testimony that the witnesses' identifications were positive or refer to it in closing argument. Therefore, the defendant is barred from raising Detective McWeeny's allegedly erroneous statement as a ground for reversal in this appeal.

### 6. Comments About the Victim's Family

The defendant next argues that he was denied a fair trial because the prosecutor introduced unnecessary and prejudicial details about the victim's family during opening and closing arguments. This court has previously condemned the introduction of otherwise irrelevant information about a crime victim's personal traits or famil-

ial relationships at a criminal trial. (See *People v. Hope* (1986), 116 Ill. 2d 265; *People v. Bernette* (1964), 30 Ill. 2d 359.) In *Hope*, however, we emphasized that every mention of a deceased's family does not *per se* entitle the defendant to a new trial. Rather, the court must consider the manner in which the references to the murder victim's family came about. *Hope*, 116 Ill. 2d at 276-78.

In *Hope*, the prosecutor repeatedly referred to the fact that the murder victim was survived by a wife and three children. In addition, the prosecutor asked the victim's wife a series of questions about the victim's children and introduced a "life and death" photograph of the victim, his wife and two of their children. The evidence was elicited incidentally, but was presented in such a manner as to permit the jury to believe it material to the defendant's guilt or innocence. In addition, the trial court overruled the defendant's objections to the evidence, thereby enhancing its prejudicial effect. *People v. Hope* (1987), 116 Ill. 2d 265, 277-78.

Here, on the other hand, many of the comments to which the defendant objects were relevant and admissible. Some reference to the victim's family during the trial was necessary and inevitable to explain the circumstances of the crime. See *People v. Jimerson* (1989), 127 Ill. 2d 12, 40-43; *People v. Simms* (1988), 121 Ill. 2d 259, 268 (references to the victim's family during trial were proper).

Although some reference to the victim's family was proper, the prosecutor did exceed the boundaries of fair comment when he informed the jury that the victim was a college professor with a doctorate, that Roger was a seminary student at the time of the crime and that Roger was an ordained minister at the time of the trial. We note, however, that these comments were elicited from witnesses or made by the prosecutor in an incidental, nonprejudicial manner. The evidence was not pre-

sented to the jury in such a manner as to cause it to believe that the personal characteristics of the victim or his family members were material to the defendant's guilt or innocence. (*People v. Free* (1983), 94 Ill. 2d 378, 415.) Therefore, we hold that the improper references to the victim's personal traits and familial relationships were not so prejudicial as to deprive the defendant of a fair trial. *People v. Jimerson* (1989), 127 Ill. 2d 12, 40-43.

## 7. Racial Comments

The defendant also complains that he was denied a fair trial when Harold Smith and Larry Stewart testified that the defendant said, as he ran by them, "brothers you all be cool" because the persons in the car were "honkies." The defendant argues that, although the racial comments were relevant, the probative value of the comments was outweighed by their prejudicial effect. The record shows, however, that the defendant did not object to the testimony at trial and the trial court had no opportunity to rule whether the racial comments were unduly prejudicial. The defendant also failed to raise the issue in his post-trial motion, and thereby waived his right to raise the alleged error in this appeal. See *People v. Stewart* (1984), 104 Ill. 2d 463, 488; *People v. Enoch* (1988), 122 Ill. 2d 176.

The defendant acknowledges his procedural default, but argues that the racial comments were so inflammatory that this court should regard the comments as plain error. We disagree. The plain error rule does not operate in the nature of a general savings clause. (*People v. Carlson* (1980), 79 Ill. 2d 564, 578; *People v. Precup* (1978), 73 Ill. 2d 7, 16.) The rule is invoked only in exceptional circumstances where the evidence is closely balanced or the alleged error was so prejudicial that it deprived the defendant of a fair trial. (107 Ill. 2d R. 615(a).) Neither of these standards is satisfied here.

As stated, the evidence was not closely balanced. Moreover, even if we agreed with the defendant that the testimony should have been excluded, we would not conclude that the alleged error was so egregious that it threatened to deprive the defendant of a fair trial. *People v. Lampkin* (1983), 98 Ill. 2d 418, which the defendant cites as authority for his claim that this testimony was prejudicial error, is distinguishable. In *Lampkin*, the defendant was charged with the murder of two white police officers. At the defendant's trial, the State sought to introduce evidence that, six years prior to the murder at issue, the defendant told another police officer in an unrelated incident, "You white honkie coppers are [expletive deleted] with us now, and we will get you later." The trial judge denied the defendant's motion to bar this statement, and overruled his strenuous objections at trial, ruling that the statement was relevant to show that the defendant had a motive to kill the slain police officers. This court reversed, holding that the defendant's statement should have been excluded because it was irrelevant and highly prejudicial. *Lampkin*, 98 Ill. 2d at 424-31.

Here, unlike *Lampkin*, the defendant did not object to the testimony before or at trial. In addition, the racial comments disputed here were directed toward the actual victims and were made only seconds after the shooting occurred. In *Lampkin*, on the other hand, the racial comments were directed at a third party rather than the murder victims, and were made six years prior to the shooting. The racial comments had no probative value and were only introduced to arouse the passion and prejudice of the jurors. (*Lampkin*, 98 Ill. 2d at 424-31.) Accordingly, *Lampkin* does not support the defendant's claim that the racial comments here were so prejudicial as to deprive the defendant of a fair trial. See also *People v. Spreitzer* (1988), 123 Ill. 2d 1, 38-39 (prosecutor's

remarks that the defendant was racially prejudiced against blacks, Asians and Hispanics was fairly based upon the evidence adduced at trial).

### 8. Evidence Suggesting Prior Criminal Conduct

The defendant also contends that he was denied a fair trial by the admission of evidence which suggested that he had engaged in prior criminal conduct. Specifically, the defendant objects to Detective McWeeny's testimony that Larry Stewart looked at photo books at Area 2 Violent Crimes but was unable to identify anyone. Subsequently, McWeeny took Stewart to Area 1 Violent Crimes, located at 5100 South Wentworth. McWeeny testified that Stewart identified a photograph of the defendant while looking through photo books at this station. The defendant claims that this testimony improperly informed the jury that he had a violent criminal background. He argues that the jury could easily have inferred that his photograph was at Area 1 Violent Crimes because he had been arrested in the past for a violent crime.

Our court has repeatedly held that evidence showing that the defendant committed prior criminal offenses is improper where its purpose is to demonstrate the defendant's propensity to commit crime. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455; see also *People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) This court has also held that evidence which suggests or implies that the defendant has a criminal history should not be admitted unless somehow relevant. (*People v. Bryant* (1986), 113 Ill. 2d 497, 514; *People v. Stover* (1982), 89 Ill. 2d 189, 196.) Evidence of other crimes is admissible, however, where relevant to prove *modus operandi*, intent, identity, motive, or absence of mistake, or if it is relevant to establish any material fact other than the defendant's propensity to commit crime. *People v. Mc-*

*Donald* (1975), 62 Ill. 2d 448, 455; see also *People v. Stewart* (1984), 105 Ill. 2d 22; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182.

Here, there was no direct evidence at the conviction stage of the trial that the defendant had engaged in criminal conduct prior to the offense for which he was being tried. At most, Detective McWeeny's testimony that Larry Stewart identified the defendant's photograph from a book at Area 1 Violent Crimes may have raised an inference in the jurors' minds that the defendant had a criminal history. McWeeny did not suggest that Stewart chose the defendant's photograph from a book containing "mug shots" or photographs of persons who had previous contact with police. While it may have been unnecessary for McWeeny to refer to the police station as Area 1 Violent Crimes, we are not persuaded that this isolated statement was so prejudicial that it deprived the defendant of a fair trial.

### 9. Cumulative Effect of Errors

The defendant finally argues that the cumulative effect of improperly admitted evidence deprived him of a fair trial. He claims that the jury's duty to determine whether the witnesses properly identified him as the criminal was contaminated by improper testimony that the witnesses had rejected thousands of photos of persons other than the defendant, and that their identifications were positive. He argues that he was also prejudiced by evidence which insinuated that an innocent man would have come forward to clear his name, but that the police were forced to obtain a warrant for his arrest because he would not cooperate and "turn himself in." The defendant claims that this testimony was improperly introduced to corroborate the witnesses' identifications of him. He argues that, without the cumulative impact of

this improper evidence, the jury might have found that he was mistakenly identified.

Even if we agreed with the defendant's claim that evidence was improperly introduced to corroborate the identification testimony, we would conclude that the cumulative effect of the errors did not deprive the defendant of a fair trial. This court has repeatedly held that the identification testimony of a single eyewitness is sufficient to sustain a conviction. (*People v. Johnson* (1986), 114 Ill. 2d 170, 189; *People v. Yarbrough* (1977), 67 Ill. 2d 222, 226.) Here, six eyewitnesses positively identified the defendant as the perpetrator of the crime. The evidence convincingly established that the witnesses viewed the defendant at the time of the crime under circumstances permitting a reliable identification. The defense attempted to show that the identifications were not reliable by suggesting that the defendant did not fit the original description of the offender. This "mistaken identification" strategy was effectively refuted by the prosecution. Several State witnesses testified at trial that the defendant looked like the assailant, except that the defendant looked "cleaner" at the trial. The defense argument that the defendant did not look like the composite sketch drawn up by the police was also refuted, when the prosecution witnesses who participated in drawing up the sketch testified at trial that they told the police, before the defendant was apprehended, that the composite sketch did not look like the assailant. In view of the fact that six highly credible witnesses identified the defendant in court, and that the defendant's mistaken-identity theory was vigorously challenged at trial, we must conclude that the errors raised by the defendant did not threaten to deprive him of a fair trial. The identification evidence overwhelmingly established the defendant's guilt.

Having determined that no reversible error occurred during the guilt phase of the defendant's trial, we affirm the defendant's convictions.

## SENTENCING ERRORS

### 1. Reliance on Section 5—5—3.2(a)(9)

The defendant also argues that a number of errors occurred during his capital sentencing hearing which require the vacation of his death sentence. The defendant first argues that his death sentence must be vacated because the trial court improperly relied upon section 5—5—3.2(a)(9) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(9)), when sentencing him to death. Section 5—5—3.2(a) lists aggravating factors a trial court may consider when imposing a term of imprisonment upon a defendant. Section 5—5—3.2(a)(9) provides:

"[T]he offense took place in a place of worship or on the grounds of a place of worship, immediately prior to, during or immediately following worship services. For purposes of this subparagraph, 'place of worship' shall mean any church, synagogue or other building, structure or place used primarily for religious worship." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(9).

The trial court raised section 5—5—3.2(a)(9) on its own initiative when imposing the death sentence on the defendant. The defendant did not object to the court's consideration of this statute at the sentencing hearing. In his post-sentencing motion, however, the defendant argued that consideration of the statute violated his right to equal protection as guaranteed by the fourteenth amendment of the United States Constitution and article I, section 2, of the Illinois Constitution. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.) He also claimed that the court's reliance upon the statute violated his right to be free from cruel and unusual punish-

ment, as guaranteed by the eighth and the fourteenth amendments of the United States Constitution, and by article I, section 11, of the Illinois Constitution. (U.S. Const., amend. VIII; Ill. Const. 1970, art. I, §11.) Finally, the defendant urged the court to reconsider his death sentence because section 5—5—3.2(a)(9) did not apply to the facts of his case. The trial court acknowledged that the statute did not apply to capital cases, but stated that he had considered the fact that the victim "had just left church" when sentencing the defendant to death. Specifically, the court stated:

"[I]t is true that I made reference to that statutory section in my sentencing. And it is true that I have considered all of the circumstances in this case, including the fact that the victims were just leaving church services. I think, however, that section applies to non-death penalty cases, specifically. However, let it be known that I did consider the fact that in imposing this sentence, that these people had just left church. If that is something that was improper to consider, it is now of record."

The trial court denied the defendant's motion to reconsider the death sentence.

In this appeal, the defendant renews his claims that the trial court's reliance upon section 5—5—3.2(a)(9) violated his right to equal protection and his rights under the eighth and fourteenth amendments. He also raises, for the first time in this appeal, a claim that section 5—5—3.2(a)(9) violates the establishment clause of the first amendment. We need only address the defendant's claim that the trial court's reliance upon section 5—5—3.2(a)(9) violated his rights under the eighth and fourteenth amendments.

The United States Supreme Court has recognized that there is a qualitative difference between death and other permissible forms of punishment. Accordingly, there is a heightened need for reliability in the determi-

nation that death is the appropriate punishment in a specific case. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (plurality opinion).) For purposes of imposing the death penalty, the eighth amendment requires that a defendant's punishment be proportional to his personal culpability and blameworthiness. *Tison v. Arizona* (1987), 481 U.S. 137, 149, 95 L. Ed. 2d 127, 139, 107 S. Ct. 1676, 1683; *Enmund v. Florida* (1982), 458 U.S. 782, 801, 73 L. Ed. 2d 1140, 1154, 102 S. Ct. 3368, 3379.

Under our death penalty statute, statutory aggravating circumstances play the constitutionally necessary function of narrowing the class of persons convicted of murder to those who are eligible for the death penalty. Once the class of defendants is narrowed to include only those eligible for the death penalty, the sentencing body may consider other relevant aggravating factors in the process of selecting from among that class those defendants who will actually be sentenced to death. *People v. Coleman* (1989), 129 Ill. 2d 321, 346; see also *Zant v. Stephens* (1983), 462 U.S. 862, 885, 77 L. Ed. 2d 235, 255, 103 S. Ct. 2733, 2747.

The trial judge here determined that the defendant killed the victim during the course of an armed robbery, and thus was subject to the death penalty under section 9—1(b)(6) of the Criminal Code. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).) At the second phase of the death penalty hearing, the trial court determined that the fact that the victim was just leaving church was a relevant aggravating factor in determining whether to sentence the defendant to death. As the trial court acknowledged at the hearing on the defendant's post-sentencing motion, however, the statute which makes the victim's proximity to church an aggravating factor (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(9)) does not apply to death penalty cases. Rather, that statute lists aggravat-

ing factors which a trial court must weigh when determining whether to impose a term of imprisonment or a term of probation and which the court may consider as reasons to impose an extended sentence of imprisonment upon a defendant.

Of course, the fact that an aggravating circumstance is not authorized by statute does not necessarily bar a trial court from considering it when sentencing a defendant to death. The State and defendant are allowed considerable leeway in the presentation of evidence at the second phase of the capital sentencing hearing. As a general proposition, any evidence which is relevant and reliable is admissible at the second phase of the death penalty hearing and may be considered in determining whether the death sentence is appropriate. *People v. Free* (1983), 94 Ill. 2d 378, 422; see also *People v. Barrow* (1989), 133 Ill. 2d 226.

The United States Supreme Court has held, however, that, when imposing a sentence of death upon a particular defendant, the sentencing body may not rely upon factors "about which the defendant was unaware, and that were irrelevant to the decision to kill." (*Booth v. Maryland* (1987), 482 U.S. 496, 505, 96 L. Ed. 2d 440, 450, 107 S. Ct. 2529, 2534.) In *Booth*, the Supreme Court considered whether the use of victim impact statements in capital sentencing proceedings violated the principle that a death sentence must be related to the moral culpability of the defendant. The Court was troubled by the implication that defendants who commit crimes against victims who were considered valuable members of their community are more deserving of punishment than defendants whose victims are perceived to be less worthy. (*Booth*, 482 U.S. at 506 n.8, 96 L. Ed. 2d at 450 n.8, 107 S. Ct. at 2534 n.8.) The Court held that victim impact statements introduced factors "wholly unrelated to the blameworthiness of a particular defend-

ant" into the sentencing hearing. (*Booth*, 482 U.S. at 504, 96 L. Ed. 2d at 449, 107 S. Ct. at 2534.) Accordingly, the court in *Booth* concluded that victim impact evidence is irrelevant to a capital sentencing decision and its introduction creates the risk that the decision to impose the death penalty was made in an arbitrary and capricious manner. *Booth*, 482 U.S. at 502-03, 96 L. Ed. 2d at 448, 107 S. Ct. at 2532-33.

The Supreme Court recently reaffirmed the principle enunciated in *Booth* in *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207. In *Gathers*, the Supreme Court held that a defendant was entitled to a new death penalty hearing because the prosecutor, at the sentencing hearing, read from a religious tract that the victim was carrying with him at the time he was attacked. In addition, the prosecutor, in closing argument, characterized the victim as a religious man and a civic-minded citizen. In that case, as here, the State argued that the information was relevant to describe the circumstances of the crime because the victim's papers, including the religious tract, were strewn around his body during the crime. The South Carolina Supreme Court rejected this argument, and held that the prosecutor's comments suggested that the defendant deserved to be sentenced to death because the victim was a religious man. The South Carolina court vacated the defendant's death sentence and remanded the cause for a new sentencing hearing. *State v. Gathers* (1988), 295 S.C. 476, 484, 369 S.E.2d 140, 144-45.

The United States Supreme Court affirmed. (*South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207.) The Court noted that the prosecutor's comments were not relevant to describe the circumstances of the crime because there was no evidence that the defendant had actually read the victim's personal papers. Accordingly, the Court, citing *Booth*, concluded

that their religious content was purely fortuitous and could not provide any information relevant to the defendant's moral culpability. (*Gathers*, 490 U.S. at 812, 104 L. Ed. 2d at 883, 109 S. Ct. at 2210.) The Court observed that " '[a]llowing the jury to rely on [this information] *** could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill.' " *South Carolina v. Gathers* 490 U.S. at 811, 104 L. Ed. 2d at 883, 109 S. Ct. at 2210-11, quoting *Booth v. Maryland*, 482 U.S. at 505, 96 L. Ed. 2d at 449-50, 107 S. Ct. at 2534.

Here, as in *Gathers*, the trial court's decision to sentence the defendant to death may have been based, in part, on a factor about which the defendant may have been unaware and that was irrelevant to his decision to kill. The trial court considered the fact that the victim had just left church when sentencing the defendant to death, even though there was no evidence to suggest that the defendant was aware of that fact or that it was a factor in his decision to kill. The crime occurred in a parking lot across the street from a church approximately 30 minutes after religious services had ended. There was no evidence that the defendant was lying in wait for unsuspecting parishioners as they left church. In fact, the State's own witness testified that at 1:30 p.m., when church services were letting out, Clarence Hayes was several blocks away attempting to rob Fortenberry Liquors. The record shows that the Roseland Christian Ministries Center was not readily identifiable as a church. Furthermore, the defendant did not approach the victims as they exited the Center. Rather, he approached them after they had crossed the street and entered the fenced lot where they had parked their cars. The evidence did not establish that this parking lot was owned by the church, was used predominantly by church

members or was marked as a church parking lot. In fact, Larry Stewart's testimony that the parking lot was "pretty full" at the time of the crime suggests that the lot was not used exclusively by persons attending church. Thus, the evidence suggests that the fact that the crime occurred shortly after the victim left church was purely fortuitous and was not a relevant factor in assessing the defendant's moral culpability.

Because there was no evidence to suggest that the defendant knew that the victims had just left church when he approached them, we must conclude that the trial court's reliance upon that fact in sentencing the defendant to death was improper. Because the trial court attached significant weight to this irrelevant aggravating factor when sentencing the defendant to death, we deem it necessary to vacate the death sentence and remand the cause to the circuit court for a new sentencing hearing as to the imposition of the death penalty only; the sentences for the other offenses will stand.

A new sentencing hearing is necessary because of the profound importance of the trial court's role in weighing aggravating and mitigating factors. (*People v. Brownell* (1980), 79 Ill. 2d 508, 535.) The trial court here considered an aggravating factor which we have concluded was irrelevant to the court's sentencing decision. A new sentencing hearing is required so that the trial court may determine, after weighing relevant aggravating and mitigating factors, whether the death sentence is appropriate. We do not intimate what the trial court's sentence should be upon remand. That decision is best left to the trial court, which saw and heard the evidence and is in the best position to impose an appropriate sentence. *People v. Brownell* (1980), 79 Ill. 2d 508, 535-36.

In view of our conclusion that the trial court improperly relied upon section 5—5—3.2(a)(9) in this case, we need not address the defendant's claim, raised for the

first time in this appeal, that section 5—5—3.2(a)(9) violates the establishment clause of the first amendment to the United States Constitution (U.S. Const., amend. I). The defendant also raises a number of other challenges to his death sentence and to the constitutionality of the Illinois death penalty statute itself. Because we conclude that the defendant is entitled to a new sentencing hearing, we address only those claimed sentencing errors which are likely to arise again.

The defendant contends that victim impact evidence was improperly introduced at the capital sentencing hearing. At the sentencing hearing, the State introduced both written and testimonial evidence about the impact of the offense upon the victim's family. The victim's son, Roger Nelson, testified at the sentencing hearing regarding his father's admirable character and the suffering that he (Roger), his wife and his mother endured after Ronald Nelson was murdered. When asked what sentence Clarence Hayes should receive, Roger expressed his belief that Hayes would kill again if given the chance. He concluded that he never wanted to know that the defendant was on the street again and never wanted any family to suffer as his family had suffered. Roger's written impact statement was also admitted at the sentencing hearing.

The State concedes that, following the post-sentencing hearing in this case, the United States Supreme Court held in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, that the introduction of victim impact evidence in a capital sentencing proceeding violates the eighth amendment. The State argues, however, that *Booth* addressed only the constitutionality of presenting victim impact evidence to a capital sentencing *jury*, and did not address the propriety of introducing such evidence at bench sentencing proceedings. The State argues that *Booth* should not be

applied to capital sentencing hearings held before a trial judge rather than a jury. This court has previously held, however, that *Booth* applies to bench sentencing hearings. *People v. Harris* (1989), 132 Ill. 2d 366; *People v. Terrell* (1989), 132 Ill. 2d 178; *People v. Crews* (1988), 122 Ill. 2d 266; *People v. Simms* (1988), 121 Ill. 2d 259.

Alternatively, the State argues that the victim impact evidence was admissible because it related directly to the circumstances of the crime. The State relies heavily upon the fact that Roger Nelson was present at the scene of the crime and was a victim of the armed robbery to support its argument that the victim impact evidence was admissible. Although the *Booth* court recognized that victim impact evidence which relates directly to the circumstances of the crime is admissible at a capital sentencing hearing (*Booth*, 482 U.S. at 507 n.10, 96 L. Ed. 2d at 451 n.10, 107 S. Ct. at 2535 n.10), we do not agree that the victim impact evidence here was admissible on this ground. Roger Nelson's testimony and written statement did not describe the circumstances of the crime. Rather, he described the admirable personal characteristics of the victim and the emotional trauma the Nelson family suffered following the crime. This is precisely the sort of testimony which *Booth* found irrelevant in a capital sentencing hearing. (*Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529.) Accordingly, we conclude that the victim impact evidence was erroneously introduced and that the State is barred from introducing such evidence on remand at the defendant's sentencing hearing.

Roger Nelson's statement that he believed that Clarence Hayes would kill again if given the opportunity was improper. As the defendant points out, this court has repeatedly condemned unsupported predictions that the defendant may commit other crimes in the future if not sentenced to death. (*People v. Holman* (1984), 103 Ill. 2d

133; see *People v. Gacho* (1988), 122 Ill. 2d 221, 256-60; *People v. Szabo* (1983), 94 Ill. 2d 327, 366; *People v. Walker* (1982), 91 Ill. 2d 502.) Such testimony improperly diverts attention from the character of the offender and the circumstances of his offense and focuses it upon a speculative possibility that may or may not occur. Such testimony conveys the misleading message that the death penalty is the only way to protect society from the defendant. (*People v. Holman* (1984), 103 Ill. 2d 133.) Therefore, the testimony should not be introduced on remand.

For the reasons stated above, the defendant's murder and armed robbery convictions and the sentences imposed for the armed robbery convictions are affirmed. The death sentence is vacated and the cause remanded to the circuit court of Cook County for a new sentencing hearing.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded*
*with directions.*