NOTICE

Decision filed 03/03/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220136-U

NO. 5-22-0136

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Coles County. |
| | ) | |
| v. | ) | No. 18-CF-307 |
| | ) | |
| JAISON PEOPLES, | ) | Honorable |
| | ) | Mark E. Bovard, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's judgment is affirmed where the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of home invasion and armed robbery under an accountability theory, and a rational fact finder could find beyond a reasonable doubt that defendant did not take steps required by statute to withdraw; further, the defendant failed to establish requisite clear or obvious error for plain error review.

¶ 2    Following a bench trial, the defendant was convicted under an accountability theory of home invasion while armed with a dangerous weapon (720 ILCS 5/19-6(a)(1) (West 2018)); home invasion while armed with a firearm (*id.* § 19-6(a)(3)); four counts of armed robbery while armed with a dangerous weapon (*id.* § 18-2(a)(1)); and four counts of armed robbery while armed with a firearm (*id.* § 18-2(a)(2)). The trial court sentenced him on the home invasion and armed robbery convictions predicated on being armed with a firearm for a total of 23 years in prison and 18

1

months of mandatory supervised release (MSR). Defendant appeals, arguing that the State failed to prove him guilty beyond a reasonable doubt in light of his defense of withdrawal; that the trial court committed plain error in allowing the State to elicit leading testimony from alleged co-conspirators; that the State improperly argued that there was evidence of flight in its closing argument; and that the State improperly attempted to impeach its own witness, and the trial court improperly allowed his prior statements to be admitted as substantive evidence. For the following reasons, we affirm.

¶ 3                                              I. Background

¶ 4      On June 1, 2018, the defendant was charged by information on one count of armed robbery of Anthony Sims. The defendant was picked up on an arrest warrant in September 2019. On September 30, 2019, the State filed an amended information charging the defendant with two counts of home invasion and eight counts of armed robbery. The defendant waived his right to jury trial, and the matter proceeded to a bench trial during which the following evidence was adduced.

¶ 5      On May 30, 2018, Anthony Sims was at his apartment with his girlfriend, Emily Peterson, and some of their friends. At approximately 10 p.m., the defendant and Chelsie Langenhorst arrived and stayed for about an hour and a half. Sims had met Langenhorst a few times through a mutual friend, and Langenhorst later introduced him to the defendant. The defendant lived a few blocks from Sims and had hung out with him a few times to smoke marijuana.

¶ 6      Sometime after 2 a.m. on May 31, 2018, three masked men carrying long guns kicked open the door to Sims's apartment. They demanded money and marijuana. Sims tried to fight the men, but he was hit twice in the back of the head with a gun. During the fight, one of the men's mask fell off, but Sims did not recognize him. Sims ended up on the couch with two of the men pointing their guns at him.

2

¶ 7    When Peterson heard the noise, she locked herself in the master bedroom. One of the masked men was beating on the bedroom door, and Peterson unlocked it. The man pointed a gun at Peterson and directed her to leave the bedroom. When she entered the living room, she saw Sims being held down on the couch by another man. The man struck Sims with his gun and instructed the other man to shoot Sims.

¶ 8    The men stole two cell phones, some money, and a small box of marijuana. Upon exiting the residence, Peterson yelled out a racial slur, and one of the men fired a gun, striking the apartment. The defendant was not one of the robbers.

¶ 9    At around 2:20 a.m., officers arrived at Sims's residence in response to the armed robbery. Former Sergeant Ryan Hurst testified that Langenhorst became a person of interest because she had been identified as being at Sims's residence prior to the incident. When the police contacted Langenhorst's cell phone provider, they discovered she was at the home of the defendant's mother, Jacqueline Peoples. Langenhorst was located and escorted out of the house by officers. The defendant was also present but was not questioned at that time.

¶ 10    Ultimately, the defendant, Langenhorst, Deonte Moore, Keywana Torry, Cameron Scott, and Melvin Galloway were arrested for the armed robbery and charged as codefendants in separate cases. Prior to the defendant's trial, the State filed a motion to admit the statements of the co-conspirators pursuant to Illinois Rule of Evidence 801(d)(2)(E) (eff. Oct. 15, 2015).

¶ 11                    A. Chelsie Langenhorst's Testimony

¶ 12    Langenhorst was called as a witness for the State. She testified pursuant to a cooperation agreement wherein she agreed to plead guilty to the armed robbery without the firearm enhancement in exchange for a sentence of six years and the required period of MSR. In addition, her probation for a previous conviction of possession of a stolen vehicle would be revoked, and

3

she would be allowed to serve the six-year sentence concurrent to the armed robbery conviction. Finally, the State would dismiss a misdemeanor charge for resisting a police officer.

¶ 13   At trial, Langenhorst testified that she helped plan the robbery with the defendant. Langenhorst and Sims smoked marijuana together. She testified that she once told the defendant that Sims would be easy to rob. The day before the robbery, Langenhorst was at the defendant's mother's house when she overheard discussions among the defendant, his son Zion Peoples, Deonte Moore, Keywana Torry, and Cameron Scott. She had never met them before. She testified that they were discussing the layout of Sims's apartment and his marijuana container because they were planning to rob him. Langenhorst testified that the defendant said that force against Sims would not be needed because Sims was not a threat. She said that she was not asked to participate in the robbery and denied any discussion about how they would get into the apartment.

¶ 14   On the night of the robbery, Langenhorst stayed at the defendant's mom's house overnight. She received numerous text messages that Sims had been robbed. When she asked the defendant about it, he told her not to worry about it because she had nothing to do with it.

¶ 15   On cross-examination, Langenhorst stated she did not recall telling the police on three occasions that the defendant told her the plan to rob Sims was dead. Defense counsel requested the police interview video be shown to refresh her recollection. After watching the video, Langenhorst testified that her statement to the police about the defendant calling off the plan to rob Sims was a lie. She acknowledged that if she had not testified against the defendant, her sentence would have been 21 years minimum to be served at 85%. She admitted that she would testify to anything the State wanted her to in order to protect herself.

4

¶ 16                    B. The Defendant's Testimony

¶ 17    The defendant testified on his own behalf. He had met Sims through Langenhorst and had been to Sims's apartment a few times to smoke or get marijuana. When he found out that Sims was into fishing, he gave Sims some fishing equipment that he found in his mom's garage in exchange for some marijuana.

¶ 18    At around 10 p.m. on May 30, 2018, Langenhorst came to the defendant's mom's house where the defendant lived. A number of people were present including the defendant, his mom, his nephew, his neighbor, his son Zion, and Zion's friends—Scott, Moore, Torry, and Torry's baby. Langenhorst told everyone that Sims had "pounds of weed" at his apartment. Although the defendant did not believe it, he asked Langenhorst to go to Sims's apartment to verify that and find out who was there.

¶ 19    Ultimately, the defendant went over to Sims's apartment later that night to find out if he really had pounds of marijuana. When he asked Sims if he had a quarter pound of marijuana, Sims stated he did not have that much. The defendant testified that at that point, he had no desire to steal any marijuana from Sims. When asked why not, he explained, "He ain't got nothing. He doesn't have nothing. The man don't got nothing. You want me to steal the fishing poles I sold him?" After learning this, sometime before midnight, the defendant went back home with Langenhorst and told everyone there was no marijuana to steal. He told Scott, Moore, Torry, Zion, and Langenhorst that "it's dead. He ain't got shit, ain't—he ain't got nothing. The man is just—she's lying." He proceeded to go inside and drink.

¶ 20    The defendant denied planning a robbery with Torry, Scott, or Galloway. He admitted that the plan was that he, Moore, and Zion would "rip off" Sims if he did in fact have "pounds of weed." He testified that another part of the plan discussed among he, Langenhorst, and Moore was

5

the possibility of Langenhorst getting the group at Sims's apartment to leave and then to leave the door open for he and Moore to go in and take the marijuana. The defendant testified that he never made plans for an armed robbery, and he denied ever owning a .223 rifle that was later found in his garage.

¶ 21    When the defendant came back from Sims's apartment after learning Sims did not have "pounds of weed," he discovered that his son Zion had a .45-caliber Kimber handgun. After the defendant found out it was Moore who gave Zion the gun, he called Moore inside and slapped "the shit out of him." The defendant stated he ran Zion's friends off and told them to get lost. He testified that afterwards, they were "talking shit" to him and his son, which he interpreted as threats of violence. The defendant did not give the .45 Kimber handgun back to Moore. The defendant testified that Moore, Scott, and Torry did not return to his house after the fight with Moore, and he claimed that he did not see Moore again until an initial court date after charges had been filed. The defendant also maintained that he had never met Galloway, did not see him on the night of the robbery, and saw him for the first time in court.

¶ 22    The defendant and Langenhorst dropped Zion at his mom's house. He dropped Langenhorst off and went home. However, because Langenhorst did not have anywhere else to stay, she came back to his house and texted him "open the door." The defendant was at home and let her inside where she spent the night.

¶ 23    When Langenhorst was located by police at the defendant's house on the night of the robbery, she was hiding in the closet. When she initially was interviewed, she lied to the police when she said she knew nothing about the robbery. However, during the same interview, she decided to tell the truth and told the police about the plan to commit the robbery, which included the defendant.

¶ 24                        C. Cameron Scott's Testimony

¶ 25    At the time of the robbery, Scott was a juvenile. He pled guilty for his role in the robbery and was sentenced to a term in the Illinois Juvenile Department of Corrections. He did not receive a plea deal in exchange for his testimony at trial.

¶ 26    Scott testified that on May 30, 2018, he went to the defendant's home in Mattoon with Moore and Torry. He testified that when he and Moore left Charleston that day, they had guns with them which they were planning to sell, although he could not recall whether they were his or Moore's guns. Scott was a friend of the defendant's son, Zion, but he had not met the defendant, Langenhorst, or Sims prior to that day.

¶ 27    At some point, Langenhorst arrived. Scott testified that while he was at the defendant's home, there was a discussion among himself, the defendant, and Moore about robbing Sims. Scott did not recall whether Langenhorst was part of the discussion, but he believed the defendant brought up the idea. He stated that the defendant expected there to be some money and a large quantity of marijuana at Sims's apartment. According to Scott, the defendant planned to take 50% of the proceeds from the robbery. He stated there was a mutual agreement that they would bring guns with them when they robbed Sims, but they would not be used. They felt it was enough that the guns be visible. Scott testified that after hearing the plan, he and Moore agreed to participate in the robbery. Scott, Moore, and Torry drove to see where Sims lived and then returned to the defendant's home and discussed when the robbery should occur.

¶ 28    At some point on May 31, 2018, Scott, Moore, and Torry went to the apartment of Melvin Galloway to see if he would be interested in robbing Sims, and Galloway agreed. They left to go to Sims's apartment building. When they arrived, Torry went to the door at Sims's apartment, knocked, and asked if she could purchase some marijuana. Scott testified that the door was left

partially open, and the three men entered carrying guns. Torry went back to the car. As they were leaving the apartment after committing the robbery, Scott heard a female shout a "racial slur," and in response, he fired his weapon into the air a few times. When they arrived back at Galloway's apartment, they discovered they had gotten only a small amount of marijuana—less than one ounce—which they divided among the three of them.

¶ 29    On cross-examination, Scott was asked if he recalled telling the police twice that the defendant had "backed out." When Scott stated he did not recall making that statement, defense counsel requested the police interview video be shown to refresh his recollection. After watching the video, Scott acknowledged making the statement and that the defendant had not been with them when they robbed Sims.

¶ 30                          D. Keywana Torry's Testimony

¶ 31    Torry testified against the defendant in exchange for her guilty plea to conspiracy to commit armed robbery and four years of probation. The State also agreed to dismiss her retail theft charges.

¶ 32    In May 2018, Torry lived with Moore, and they had a child together. She testified that she went to Mattoon with Scott, Moore, and her baby. They went there to hang out with her sister. At some point, they went to Zion's house, whom she knew through Moore. Torry did not have a relationship with the defendant, and she did not socialize with him. She, Moore, their toddler, and Scott went to the defendant's house to drink when it was still light out. When they arrived, Zion, the defendant, and the defendant's mom were there. Just she, Moore, and Scott were drinking.

¶ 33    After a couple of hours, Langenhorst, whom she had never met, arrived. Torry testified that she overheard a conversation about an armed robbery while she was on the sidewalk playing with her child. She testified that Scott, Moore, the defendant, and Langenhorst were on the driveway

8

when she overheard Langenhorst state that "they sold weed in the house, and they had pounds of weed." Torry stated that the defendant, Scott, and Moore wanted to steal marijuana from Sims's apartment, and she heard the defendant say to "get the guns." Torry stated that she did not agree to participate in the armed robbery.

¶ 34 Torry, Moore, and Scott left the defendant's home and went to the location of the planned robbery, and then they went back to her sister's house to wait until it was time to commit the robbery. When they got to her sister's house, Galloway was there. She did not hear a discussion with Galloway about the armed robbery. Torry testified that they then left to go back to pick up the defendant and Langenhorst. Galloway took her sister's car. When they arrived at the defendant's house, Moore got out of the car and spoke with the defendant. They then left to rob the house. The defendant and Langenhorst were following behind them in the defendant's car. Torry testified that the defendant pointed out Sims's apartment, and then he kept on driving.

¶ 35 Torry testified that there was a conspiracy to rob Sims, and it was Langenhorst who had made up the plan, stating, "She knew them. We didn't." When Torry was asked if she recalled telling the police that the defendant and Langenhorst had both exited Sims's house five minutes prior to their arrival, she did not recall. After watching the police video to refresh her recollection, Torry admitted that she had lied to the police when she made that statement.

¶ 36 On cross-examination, Torry testified that it was Langenhorst who made up the plan and reported that there were pounds of marijuana at Sims's apartment. However, on redirect examination, Torry testified that both Langenhorst and the defendant stated there would be a large quantity of marijuana at Sims's apartment.

9

¶ 37    Torry testified that she had seen the defendant with a rifle at his residence. On recross-examination, she stated that the defendant had provided the guns for the robbery, although she admitted that she initially had told the police that the guns belonged to Scott.

¶ 38                              E. Melvin Galloway's Testimony

¶ 39    Galloway testified on behalf of the defendant. Galloway had entered into a cooperation agreement; in exchange for his truthful testimony, he would receive 9 years in the Illinois Department of Corrections (IDOC) on the charge of armed robbery instead of the 21 years he was facing.

¶ 40    When Galloway was interviewed initially by the police, he did not recall the defendant's name. During a meeting with the State and defense counsel, Galloway reported that the plan for the robbery came together two weeks before it was committed. He stated that Scott, Moore, Torry, and the defendant were at an apartment in Charleston smoking marijuana and some of them were drinking when the conversation came up about the robbery.

¶ 41    He testified that the defendant told them that "he had a place for [them] to hit a lick" for "drugs and money." Before that conversation, Galloway neither knew Sims nor that his apartment would be a good target for a robbery. Langenhorst had given them the address and the layout of Sims's apartment.

¶ 42    At trial, Galloway testified that Moore and Scott recruited him to participate in the robbery. He told police that on the day of the robbery, he went to get guns from the defendant's house and the defendant was there. Galloway testified that when they left to commit the robbery, he took his car, while Scott, Moore, Torry, the baby, and the defendant were all packed in Torry's car. Galloway testified that although the plan originally came from Langenhorst, she was not around

10

during the robbery. He stated that Langenhorst knew the people they were going to rob, and she was supposed to go to their house and leave the door open so they could rob them.

¶ 43　However, when they could not reach Langenhorst, they had to come up with a new plan. Galloway testified that he, Torry, Moore, Scott, and the defendant planned the robbery in the alley by Sims's apartment after they got to the parking lot. The idea of Torry knocking on Sims's door was made up in the parking lot. He denied telling the police that Moore planned everything.

¶ 44　Galloway testified that on the night of the robbery, the defendant backed out of the robbery. Although the defendant previously had participated in discussions about the robbery, on the night of the robbery, the defendant did not have much input in the plan. He stated the defendant stayed in the car, but he did not tell them not to go in. He testified that after the robbery, he followed Torry's car back to his place, and they divided the proceeds.

¶ 45　　　　　　　　　　　F. Deonte Moore's Testimony

¶ 46　Moore was called as a witness by the defense and asserted his fifth amendment right not to testify and subsequently was discharged. However, Moore's videotaped police interview was shown to the trial court. In that interview, Moore initially claimed that he was asleep when the robbery took place, but he later reported that the defendant and Langenhorst set up the robbery and that discussions about how to get into Sims's apartment took place at the defendant's home.

¶ 47　　　　　　　　　　　G. Zion Peoples' Testimony

¶ 48　At the time of the robbery, the defendant's son Zion was 15 years old. Zion testified on behalf of the State and the defense. On April 24, 2018, Moore texted Zion about wanting to do a robbery. Zion knew Moore, who lived across the street from his mom's house. Zion testified that Moore was unemployed and smoked marijuana every day. Zion's role was to introduce Moore to people to rob when Moore needed more marijuana. These robberies were described as a "lick,"

11

which Zion explained was a way to get marijuana without paying for it. Moore texted Zion, "we need something big for that 75," and Zion texted back asking if they were buying or stealing. Zion texted Moore, informing him that someone named Alex, who was known for dealing drugs, was available to be robbed. Moore responded by asking, "yeah, where he at." Moore previously had robbed Alex on two occasions. Prior to May 2018, Moore told Zion that he had used a gun to rob someone. Zion testified that the "licks" were decreasing for him because he was trying to distance himself even though Moore was trying to pressure him.

¶ 49    On May 30, 2018, Zion arrived at his grandma's house in the afternoon. His grandma and the defendant were there. Moore, Scott, and Torry came over while it was still light out. The group played basketball in the side yard and smoked marijuana. His friends were drinking. The defendant was not with them.

¶ 50    Earlier in the day, Zion had been texting Moore about buying guns. He lied to Moore when he said that the defendant and his friend wanted to purchase the guns. Zion wanted the handgun for himself, but he did not think Moore would give him one. He wanted Moore to believe that he was the middleman in the gun purchase. When he was interviewed by the police, Zion told them that the defendant was the one telling him to text Moore and to ask where he was and what to bring. Although Zion had told the police that he was just the middleman between the defendant and Moore in these texts, at trial he testified that it was not true.

¶ 51    When Moore arrived at the defendant's home, he had three guns with him. On cross-examination, Zion testified that Moore asked him to hide a gun with a scope for him, which they both referred to as a .223. Moore asked if Zion could hide it in his grandma's house, but Zion said no. Zion suggested the garage and grabbed keys from the key holder to hide it there. Zion stated that he did not discuss the guns with the defendant, and he did not intend to return the .223-caliber

12

gun to Moore. Zion testified that the defendant took the .45 Kimber handgun away from Moore and refused to give it back. He stated that the defendant argued about this with Moore. At the time, the defendant did not know about the rifle in the garage. Zion testified that he did not see the defendant holding the .223 gun that night.

¶ 52    Zion testified that he was present when the defendant, Langenhorst, Moore, and Scott were discussing robbing Sims and that he was part of the conversation. Zion admitted that he told the police it was the defendant who wanted to commit the robbery. Zion overheard Langenhorst say she would leave the door to Sims's apartment unlocked so they could get in and rob him. When asked about the plan to rob Sims, Zion responded, "There's never been a set plan. I mean just to get—get weed from the guy." Zion testified that the defendant told them that they could basically just walk in and tell Sims to give them the marijuana.

¶ 53    Zion testified that the defendant caught him with the Kimber handgun, took it, and went outside and confronted Moore. He recalled the defendant getting into a verbal fight with Moore which ended with the defendant smacking Moore with his palm. After this, Scott, Moore, Torry, and the baby left. They did not leave on amicable terms. Zion testified that at 11:53 p.m. on May 30, 2018, Moore texted him that he was coming to get his guns back. Zion believed that Moore was threatening him and that Moore was angry because the defendant had taken his guns.

¶ 54    Zion testified that when he got dropped off at his mom's house by the defendant and Langenhorst, he drove because the defendant had been drinking. Zion stated that the defendant took his cell phone because he thought Zion was being disrespectful to him.

¶ 55    When Zion was interviewed by police, he told them that the defendant said the lick was dead, which meant "it's over." He also told police the defendant "doesn't play for little bucks,"

13

meaning "he ain't on the type of petty stuff that we are." Zion testified that the defendant did not take ounces from people. He stated that he and Moore sold guns supplied by Scott.

¶ 56    On recross, Zion testified that Langenhorst's role in the plan was that she knew the man with the marijuana and would leave the door unlocked for the others to go in and get the marijuana without anyone getting hurt. Zion did not go with the men to rob Sims.

¶ 57    Zion testified that he recalled being interviewed by the police regarding the armed robbery and stated that he had told the truth during the interview. The State asked Zion a number of questions based on the statements he had made to the police during the interview. Specifically, the prosecutor asked Zion:

> "[THE STATE:] Now—now, on May 30, 2018, did you drive [the defendant], [Moore], and Cameron Scott passed [*sic*] Anthony Sims' house so they could look at it?
>
> [WITNESS:] No."

Zion testified that he did not recall telling the police that the defendant had asked him to drive nor did he recall telling them that the defendant was in the front seat or that Moore and Scott were in the back seat.

¶ 58    The State called Officer Hurst to impeach Zion with his prior statements. The State played a video clip of the police interview in which Zion stated that he drove around so that "they could see the house," and when he was asked who was in the vehicle, Zion stated that Moore and Scott were. The State then played another clip from the interview in which Zion was asked again about driving around Sims's apartment around 8 p.m., and Zion stated that the defendant, Scott, and Moore were with him and that the defendant was in the front seat.

¶ 59    Defense counsel objected to the State's video clips, arguing that they did not impeach Zion's testimony that the defendant was never in the car. The trial court overruled the objection.

14

¶ 60                          H. Detective Michael Johnson's Testimony

¶ 61    Detective Johnson conducted forensic extractions on the cell phones of Langenhorst, Moore, Scott, and Zion. The evidence revealed that two days before the robbery, Zion sent a text message to Moore, "Keep the AR bro u need it f[or] what we [are going to] do Saturday *** [and] my pops lick." The afternoon before the robbery, Moore texted Zion, "Ask yo[ur] dad to have that ready. I'm onnat. Soon as I pull up." When Zion asked, "Wat ready," Moore responded, "[t]hat stain wit[h] Anthony," meaning the robbery of Anthony Sims. About an hour later, Zion texted Moore, "[Where you at] my dad waiting on u fa he hav sum else do it." Moore later told the police that the defendant was "rushing him" and conveying, in effect, that he was going to "ask somebody else to hit the lick" if Moore did not come soon.

¶ 62                            I. Jacqueline Peoples' Testimony

¶ 63    The defendant's mother Jacqueline was called as a witness by the State. In May 2018, the defendant was living with her and had been remodeling her house. She recalled that in May 2018, the police conducted a search of her home and garage pursuant to a warrant. When the police searched her garage, they found a rifle, but Jacqueline did not know why it was there. The police could not confirm whether the rifle was one of the weapons used in the robbery.

¶ 64    Although the defendant lived with Jacqueline, he was not at home when the police arrived. She recounted that she called the defendant and told him that the police were there and wanted to speak with him. The defendant told her that he would come home soon, but he never arrived. After more than an hour, Jacqueline called her son two more times. She did not hear from the defendant again for more than three or four weeks or more and was worried for his safety. Jacqueline stopped at the police station several times because she had no idea where the defendant was, and she was worried about him. Jacqueline testified that a family member had passed away on May 28, 2018,

15

and although the defendant was supposed to go with her to the funeral in Mississippi, he failed to show.

¶ 65    On cross-examination, Jacqueline testified that the defendant was "bickering" and shouting expletives at one of Zion's friends that night. She told everybody to get out of her house, and she stated that she heard a young woman say something to the effect of, "[L]et's go. We can do our own robbery."

¶ 66    After the State rested, defense counsel moved for a directed finding, arguing that the State failed to meet its burden of proof. The State countered that viewing the evidence in a light most favorable to the State, evidence had been presented that the defendant was part of the planning of the armed robbery. The trial court noted there was some conflicting evidence in the matter but, nevertheless, found there was sufficient evidence to deny the motion for directed finding.

¶ 67                              J. State's Closing Argument

¶ 68    In closing, the State argued that the defendant was guilty under an accountability theory because he shared in the common criminal intent to rob Anthony Sims. The State likened the defendant to a "football team captain," with Langenhorst as the "co-captain." In keeping with that analogy, the State noted that the defendant and Langenhorst had a particular play in mind—a "lick" at Sims's apartment—and they simply needed to coordinate "how, when, and who to get into" that apartment. In short, the State argued that the defendant and Langenhorst "helped the intruders set up the play," and without the defendant and Langenhorst's planning, "no armed robbery or home invasion would have occurred."

¶ 69    The State also highlighted evidence of the defendant's consciousness of guilt after the robbery. Specifically, the prosecutor stated:

16

"Next thing that's important is consciousness of guilt because after Chelsie Langenhorst's apprehended, [the defendant] skips town.

*** [The defendant] skipped town so he wouldn't get caught. He didn't even tell his mother, who had opened up her home to him, who he had seen every day since he had moved back in with her that he was leaving.

[The defendant] left his mom's house with unfinished remodeling, didn't tell anyone where he was going, and didn't contact his mother for almost three to four weeks.

He also skipped out on a trip to Mississippi that he was expected to go to to see a loved one's funeral."

¶ 70    Defense counsel did not object to this argument. The State also sought to rebut the defendant's withdrawal defense, highlighting Galloway's testimony of the defendant's continued participation in the robbery to undercut the notion that the defendant called the plan "dead." At most, the State argued, the defendant merely "[sat] on the bench for the play," but he was "still on the team."

¶ 71    Defense counsel argued that the defendant had withdrawn from the criminal plan and was therefore not accountable under the law. Defense counsel explained that the defendant backed out of the plan; he pulled his son Zion out of the plan; he called the plan "dead" and kicked the "players" out of his house. He argued that Moore and Scott were the driving forces behind the robbery. In response to the State's argument that the defendant had left town, defense counsel pointed out that he was at home hours after the robbery when the police were looking for Langenhorst.

¶ 72    On rebuttal, the State rhetorically asked why the defendant ran if he had nothing to do with the robbery. The State emphasized that the defendant "[r]an out on his mom" and did not contact

17

her, leading her to go to the police station to inquire about what was going on with her son. Defense counsel did not object to this characterization.

¶ 73                    K. Verdict, Motion for New Trial, and Sentencing

¶ 74    On October 5, 2021, the trial court found the defendant guilty on all charges. The defendant moved for a new trial, arguing, *inter alia*, that the uncontroverted evidence showed that the defendant withdrew from the robbery and, therefore, he was not accountable for the crimes. The State responded that the defendant's withdrawal defense failed as a matter of law because he did not terminate his efforts to promote or facilitate the crime's commission and took none of the steps required by statute.

¶ 75    At the hearing on the defendant's motion, the trial court made the following findings of fact: the defendant was charged under a theory of accountability; at the time of the home invasion/armed robbery, the defendant was not present; the defendant participated in a plan to rob Sims and the three other occupants of the residence; and the defendant did not withdraw from the process. The trial court further found:

> "After reviewing [the evidence], it was the Court's conclusion then, and it remains the Court's conclusion, that the Defendant did take part in this plan to rob Anthony Sims and the other three occupants of that residence. It's evident from his testimony. It's evident from the text messages.

> * * *

> It's apparent to the Court that [the defendant] was an integral part in planning this robbery. He knew Mr. Sims. He and Ms. Langenhorst knew of the potential. It just turned out at the end of the day, he wasn't the whale or the big hit that they had in mind. **\*\*\***

> \*\*\*

18

He did not deprive his or her prior—his prior efforts of effectiveness in the commission of the crime; he did not give timely warning to law enforcement; and he did not otherwise take proper effort to prevent the commission of the crime.

In this matter, [the defendant] simply said, by his account—at least for the purpose of this, I will say 'by his account'—that he was out. He didn't call Anthony Sims and say, 'Hey, be on the lookout, these guys are coming over to steal weed from you.' He didn't call the police and say, 'Hey, we have been going about this plan all day, I'm out of it, but I think these other guys are going over there.'

He didn't do anything to otherwise stop Moore, Scott or Torry from going over there. I think the evidence was he stayed at that address on Charleston Avenue and began to drink.

So, from a factual standpoint, the Court found and finds again that [the defendant] planned this robbery and he participated into it. I could use the cliche 'got the ball rolling,' 'lit the fuse.' It was his idea and he got these young, impressionable people fired up and he did not adequately withdraw from this enterprise, as required under the law."

¶ 76    The trial court denied the defendant's motion and sentenced him to 8 years in IDOC with a mandatory 15-year firearm enhancement plus 18 months of MSR. The defendant timely appealed.

¶ 77                                          II. Analysis

¶ 78    On appeal, the defendant argues the State's evidence was insufficient to prove beyond a reasonable doubt that he is guilty of home invasion and armed robbery in light of his defense of withdrawal; that the trial court committed plain error in allowing the State to elicit leading testimony from alleged co-conspirators; that the State improperly argued in its closing argument

there was evidence of flight; and that the State improperly attempted to impeach its own witness, and the trial court improperly allowed his prior statements to be admitted as substantive evidence.

¶ 79                                    A. Sufficiency of Evidence

¶ 80    We turn to the defendant's contention that the State failed to prove him guilty of home invasion and armed robbery beyond a reasonable doubt. Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. In determining if there is sufficient evidence to convict, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004). It is not the function of a reviewing court to retry the defendant or substitute its judgment for that of the finder of fact. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26. A reviewing court gives the State the benefit of all reasonable inferences. *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007). A defendant's conviction will be reversed only where the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *Id.* at 115.

¶ 81    As charged here, home invasion involves entering the dwelling place of another when one or more persons are present and, while armed with a dangerous weapon or firearm, using force or threatening the imminent use of force upon any person or persons within the dwelling. 720 ILCS 5/19-6(a)(1), (a)(3) (West 2018). Armed robbery involves taking property by use or threat of force while armed with a dangerous weapon or while carrying a firearm. *Id.* §§ 18-1(a), 18-2(a)(2). The record establishes the defendant was not present at the time of the home invasion and armed robbery; instead, he was charged under an accountability theory.

20

¶ 82   The State's theory at trial was that the defendant entered into a common criminal plan with his co-conspirators to rob Sims and, thus, was accountable for their actions. The defendant argues that to the extent that he was involved in a potential plan to steal marijuana from Sims, the plan did not involve the use of guns, and the plan quickly dissipated when he learned that Sims did not have a substantial amount of marijuana. The defendant further argues that while he entertained the idea of stealing marijuana from Sims, there is no evidence that he took further steps to facilitate the robbery or that he had an active role in the home invasion and armed robbery. Finally, he argues that not only did this group of individuals have a history of planning and committing robberies without him, he did not receive any of the proceeds from the robbery.

¶ 83   "A defendant may be deemed accountable for acts performed by another if defendant shared the criminal intent of the principal, or if there was a common criminal plan or purpose." *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995); see 720 ILCS 5/5-2(c) (West 2018). "[A]ctive participation has never been a requirement for the imposition of criminal guilt under an accountability theory." *Taylor*, 164 Ill. 2d at 140.

¶ 84   The State contends, and we agree, that when viewed in the light most favorable to the prosecution, the evidence proved beyond a reasonable doubt that the defendant was accountable for the crime he had planned and the crimes executed by his co-conspirators. The defendant was integral to planning the robbery. Regardless of the minor differences in their version of events, each of the defendant's testifying co-conspirators confirmed as much. None of the co-conspirators had met Sims prior to the armed robbery, nor did they know he would have marijuana. They were informed of these things by the defendant and Langenhorst. The defendant's son Zion likewise testified that the defendant discussed with the others a plan to rob Sims.

21

¶ 85    The defendant's active role in planning the home invasion and armed robbery is best illustrated by the steps he took in the hours leading up to it. In his trial testimony, the defendant acknowledged that he sent Langenhorst to Sims's apartment on the night of the robbery for three reasons: to confirm that Sims had large quantities of marijuana; to find out who else was at Sims's apartment; and to attempt to get them to leave so Langenhorst could unlock Sims's apartment door to make it an easier robbery. The defendant also admitted to personally engaging in further fact finding to independently verify whether Sims had "pounds of weed."

¶ 86    There was evidence presented at trial through the defendant's co-conspirators that prior to the home invasion and armed robbery, the defendant informed them of the layout of Sims's apartment, the potential location of the marijuana, and his assessment that Sims posed a minimal threat such that the group did not need firearms. To be sure, the trial court heard conflicting testimony from the defendant's co-conspirators. However, the trial court acknowledged and accounted for both the inconsistencies in their testimony and their incentives to testify. It is the duty of the trier of fact to assess the credibility of the witnesses, assign the appropriate weight to testimony, and resolve discrepancies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004).

¶ 87    In sum, when viewed in the light most favorable to the prosecution, a rational fact finder could find beyond a reasonable doubt that the defendant devised a criminal plan to commit a robbery at Sims's apartment and was thus accountable for his co-conspirators' actions in executing that plan, including their decision to be armed during the commission of the robbery. See *People v. Fernandez*, 2014 IL 115527, ¶ 16 (citing *People v. Kessler*, 57 Ill. 2d 493 (1974) (under common design rule, once defendant agreed to participate in burglary, he was liable for every criminal act committed in connection therewith, including the unplanned shootings committed by his initially unarmed companions)). "The common design rule provides that where two or more persons

22

engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *People v. Perez*, 189 Ill. 2d 254, 267 (2000). Once a defendant is accountable for another's actions, "he remains so until he detaches himself from the criminal enterprise," *i.e.*, unless he withdraws from the scheme. *People v. Ruiz*, 94 Ill. 2d 245, 256 (1982). Thus, the question becomes whether the defendant withdrew from the common criminal plan.

¶ 88                          B. Affirmative Defense of Withdrawal

¶ 89     The affirmative defense of withdrawal provides that a person is not accountable if before the commission of the offense, he terminates his effort to promote or facilitate that commission *and* does one of the following: "(i) wholly deprives his or her prior efforts of effectiveness in that commission, (ii) gives timely warning to the proper law enforcement authorities, or (iii) otherwise makes proper effort to prevent the commission of the offense." 720 ILCS 5/5-2(c)(3) (West 2018).

¶ 90     The defendant maintains the evidence supports his contention that he effectively withdrew from the plan when he informed his codefendants the deal was "dead." He argues the other parties clearly understood that his intent was to withdraw. He further argues that he took affirmative steps to thwart the execution of the plan when he told his codefendants that Sims simply did not have enough marijuana to rob, which was the purpose of their original plan. This information, he insists, should have deterred the group who were planning to steal marijuana from Sims. Furthermore, the defendant argues he took one of the guns away from Moore that potentially could have been used in the armed robbery, removed his son Zion from the group, and took away Zion's cell phone in an effort to prevent him from assisting in any potential future criminal activities in which Zion's friends desired to engage.

23

¶ 91 While the defendant may have terminated his effort to promote or facilitate the home invasion and armed robbery when he announced the plan was "dead," when viewed in the light most favorable to the prosecution, a rational fact finder could find beyond a reasonable doubt that the defendant did not take the additional steps required by law to negate criminal liability for the home invasion and armed robbery. See *People v. Trotter*, 299 Ill. App. 3d 535, 540 (1998) ("Testimony that a defendant merely discontinued active participation before the offense was complete, without taking some step to 'neutralize' the effect of his conduct, will not entitle a defendant to a withdrawal instruction.").

¶ 92                          C. Improper Questioning by the State

¶ 93 The defendant first contends that the trial court erred in permitting the State to ask leading questions of his co-conspirators. The State argues, and the defendant concedes, that he failed to preserve this issue for appeal. Illinois courts have long held that in order for a criminal defendant to preserve an issue for review on appeal, the defendant must object at trial and raise the issue in a written posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15. "Failure to do so forfeits any review of the error." *Id.* The plain error rule is a narrow exception to forfeiture principles; however, the rule does not call for the review of all forfeited errors. *Id.* ¶¶ 18-19. Rather, the rule allows review of a claim of error only if the defendant establishes plain error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 94 To obtain review of a forfeited issue under the plain-error doctrine, "the first step in the analysis is to determine whether a clear or obvious error occurred." *Jackson*, 2022 IL 127256, ¶ 21. If a defendant overcomes that obstacle, an error may be noticed "only if the error falls under the purview of one of two alternative prongs: (1) where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the

24

evidence or (2) when a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.* ¶ 19

¶ 95　　The State correctly notes that the defendant's general claim is that the State improperly elicited leading testimony throughout trial. However, the onus is on the defendant to specify which testimony he finds objectionable so that his claim of error can be meaningfully reviewed. See *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 ("Without facts in the record to support arguments raised," defendant's arguments on appeal "amount to no more than bare contentions, which do not merit consideration and are deemed forfeited."). It is not this court's job to comb the trial transcript for any prejudicial leading questions, as " '[j]udges are not like pigs, hunting for truffles buried in briefs.' " *People v. Shelton*, 401 Ill. App. 3d 564, 575 (2010) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Therefore, this court will confine its review to the specific statements identified by the defendant.

¶ 96　　Here, the defendant asserts that the trial court's error in allowing the prosecutor to lead its witnesses was clear and obvious. The defendant asserts that the State took full advantage of being allowed to lead witnesses because it was imperative to the State's case to prove that the defendant had some kind of role in the armed robbery that occurred after he said the plan was "dead." Without leading the witnesses, he argues, who were already impeached with inconsistent statements and shown to be interested parties, the State would not have been able to present any evidence of the defendant's accountability. Only with the State's leading questions and assumptions was the prosecution able to convince the trial court that the defendant was accountable for an armed robbery that he had nothing to do with.

¶ 97　　The defendant specifically identified the following example of leading questions from Scott's testimony:

25

"[THE STATE:] *** How did the topic of the robbery come up?

[WITNESS:] Just amongst the conversation, it just eventually got brought up, I believe.

* * *

[THE STATE:] Who brought it up?

[WITNESS:] I believe Pops.

[THE STATE:] *** What did Pops say?

[WITNESS:] He just told us that he knew of a lick and then *we* elaborated from there.

[THE STATE:] When *he* elaborated from there, what did he say?

[WITNESS:] Just the details of what perhaps could be in the house." (Emphases added.)

¶ 98    The defendant presented yet another example from Scott's testimony that he claims were leading questions. After Scott testified what the defendant allegedly stated about there being large amounts of marijuana in Sims's apartment, the State asked, "What else did he say?" and continued, "Was there any discussion about how the proceeds from the robbery would be divvied up?" Scott responded, "Yes." When Scott was asked to elaborate, he then stated the defendant was to take 50%. Then, after being asked by the State if there was any talk about using guns, Scott testified that he believed so. The defendant contends that the State's questions were all leading because they were suggestive that there was more that the defendant said than Scott initially testified, and then even suggested that the defendant was part of the discussions about using guns.

¶ 99    Leading questions are, by definition, suggestive. "A 'leading question' is one 'that suggests the answer to the person being interrogated; espec[ially] a question that may be answered by a

26

mere "yes" or "no." ' " *People v. Miles*, 351 Ill. App. 3d 857, 866 (2004) (quoting Black's Law Dictionary 897 (7th ed. 1999)). Here, the defendant's challenges to Scott's testimony fail because the State's questions were not leading. The record does not support the defendant's claim that the State improperly suggested answers. In context, the State's questions to Scott sought clarification and further information, which was not elicited through leading questions.

¶ 100    The defendant next argues that the trial court erred in overruling the defendant's objection to Torry's testimony on redirect examination where the State was asking leading questions. The defendant maintains that after defense counsel's objection was overruled, the prosecutor continued to lead Torry, resulting in Torry changing her testimony that both Langenhorst and the defendant had discussed the large amount of marijuana. Moreover, the defendant argues that based on Torry's responses to the State's leading questions, it was clear that the State led her into changing her testimony when it did not suit the State's theory.

¶ 101    On redirect examination, the following colloquy occurred:

"[THE STATE:] Now, you—you—I just want to clarify one thing. You had testified on direct examination that it was the defendant who suggested there would be a large quantity of marijuana?

[WITNESS:] Yes."

¶ 102    When defense counsel objected and argued that this question mischaracterized the testimony, the trial court overruled the objection. Cross-examination continued:

"[THE STATE:] So I just want to clarify. Who—who said that there was—there was going to be this large quantity of marijuana in the house?

[WITNESS:] [The defendant] and Chelsie.

[THE STATE:] They both said it?

27

[WITNESS:] Both."

¶ 103   Once again, the record does not support the defendant's argument. A leading question is one that suggests the answer by putting into the witness's mind the words or thought of the answer. *People v. Lane*, 256 Ill. App. 3d 38, 59-60 (1993). Accordingly, we find no error.

¶ 104                    D. Improper Closing Arguments

¶ 105   The defendant asserts that during closing argument, the State improperly referred to evidence of his flight as consciousness of guilt. The State contends that this argument is also forfeited because the defendant neither objected to the statement at trial nor included the alleged error in his motion for new trial; furthermore, the defendant raised the argument for the first time in his reply brief. In *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000), the Illinois Supreme Court rejected the State's argument that a defendant cannot request plain error review for the first time in his reply brief; thus, we will excuse the defendant's forfeiture of this issue.

¶ 106   In addressing a claim of plain error, a reviewing court must first consider whether error occurred at all. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008). Flight by the defendant is generally considered some evidence of a guilty mind. *People v. Davis*, 2023 IL App (1st) 220231, ¶ 42. "In particular, a defendant's flight from police also indicates consciousness of guilt." *Id.*

¶ 107   The defendant submits that the State's remarks in closing argument were plain error, because they were improper and substantially prejudicial. He argues that the remarks concerning consciousness of guilt were improper because when the State uses evidence of flight, it must first establish that the defendant knew he was being pursued by police, which was not done here. See *People v. Hayes*, 139 Ill. 2d 89, 132 (1990) (evidence of a defendant's guilty conscience depends on his knowledge that a crime was committed and that he is suspected of committing it), *abrogated on other grounds by People v. Tisdel*, 201 Ill. 2d 210 (2002). The defendant maintains there was

28

no evidence that he fled the jurisdiction because he was conscious of his guilt; to the contrary, he argues, he spoke to the police in his mom's home on the same day of the armed robbery when they came to his house looking for Langenhorst.

¶ 108   "A defendant arguing that reversal of his conviction is warranted on the basis of improper closing argument faces a difficult burden." *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 48 (citing *People v. Gutierrez*, 402 Ill. App. 3d 866, 895 (2010)). "[R]eversal is only warranted if the improper remarks were a material factor in the jury's verdict." *Id.* Prosecutors are allowed wide latitude in closing argument and may argue facts and reasonable inferences drawn from the evidence. *People v. Williams*, 192 Ill. 2d 548, 573 (2000).

¶ 109   In the case relied upon by the defendant, the *Hayes* court found there were no facts from which the jury could validly infer that the defendant knew he was a suspect and consciously avoided the police. *Hayes*, 139 Ill. 2d at 132. The trial evidence established that a detective went to the defendant's home and asked an elderly man if he could speak with the defendant. *Id.* at 107. After learning the defendant was not home, the detective left his business card and phone number with the man and asked the man to have the defendant call him when he got home. *Id.* Police returned a number of times to the defendant's parents' home in an effort to locate him. *Id.* The *Hayes* court found there was no evidence that the defendant received the detective's business card, that he was informed by family members the police were looking for him, or that he was living at his parents' home prior to his arrest. *Id.* at 132. The *Hayes* court concluded that the evidence did not support an inference that the defendant consciously avoided apprehension.

¶ 110   In the case at bar, there is ample evidence that the defendant knew that a crime was committed and that he was suspected of committing it. On the night of the home invasion and armed robbery, Langenhorst informed the defendant she had received numerous text messages

29

informing her that Sims had been robbed. The defendant's mother Jacqueline testified that a few days later the police were at her home where the defendant had been living. She testified that she called her son and told him the police were there and wanted to talk to him. Although the defendant told her that he would be home soon, he never arrived, and she did not see the defendant for several weeks after. Thus, we find no error was committed by the State regarding this portion of its closing argument.

¶ 111                              E. Prior Inconsistent Statements

¶ 112   The defendant next argues that the trial court erred in allowing Zion's prior statements to the police to be admitted as substantive evidence where those statements were not inconsistent with his trial testimony and did not affirmatively damage the State's case. Specifically, the defendant contends that the trial court erred in permitting the State to introduce a clip of Zion's video police statement. In spite of the State's argument that this issue was also forfeited, we will address the defendant's request for plain error review. See *Williams*, 193 Ill. 2d at 347-48. At the outset, we reject the premise that Zion's prior statements were admitted as substantive evidence where the record establishes the State offered the statements to impeach Zion.

¶ 113   Turning to the substance of the defendant's argument, we are mindful that in addressing a claim of plain error, we must first consider whether an error occurred at all. *Hudson*, 228 Ill. 2d at 191. When Zion was interviewed by the police, he told them that the defendant, Scott, and Moore were with him when he drove around Sims's apartment. At trial, Zion denied doing so. These are clearly inconsistent statements. See *In re T.R.*, 2019 IL App (4th) 190529, ¶ 144 ("prior inconsistent statements by a witness are generally admissible for impeachment purposes").

¶ 114                                       III. Conclusion

¶ 115    After a thorough review of the entire record and considering the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of home invasion and armed robbery under a theory of accountability, beyond a reasonable doubt. For the foregoing reasons, we affirm the defendant's conviction.


¶ 116    Affirmed.